## KELLER *v.* UNITED STATES.

## ULLMAN *v.* UNITED STATES.

ERROR TO THE DISTRICT COURT OF THE UNITED STATES FOR THE NORTHERN DISTRICT OF ILLINOIS.

Nos. 653, 654. Argued March 1, 1909.—Decided April 5, 1909.

Speaking generally, the police power is reserved to the States and there is no grant thereof to Congress in the Constitution.

Notwithstanding the offensiveness of the crime the courts cannot sustain a Federal penal statute if the power to punish the same has not been delegated to Congress by the Constitution.

Where there is collision between the power of the State and that of Congress, the superior authority of the latter prevails. While Congress has power to exclude aliens from, and to prescribe the terms and conditions on which aliens may come into, the United States, *Turner* v. *Williams,* 194 U. S. 279, that power does not extend to controlling dealings with aliens after their arrival merely on account of their alienage.

That portion of the act of February 20, 1907, c. 1134, 34 Stat. 898, which makes it a felony to harbor alien prostitutes *held*, unconstitutional as to one harboring such a prostitute without knowledge of her alienage or in connection with her coming into the United States, as a regulation of a matter within the police power reserved to the State and not within any power delegated to Congress by the Constitution.

Section 3 of the act of Congress of February 20, 1907, c. 1134, 34 Stat. 898, 899, entitled "An act to regulate the immigration of aliens into the United States" reads as follows:

"Sec. 3. That the importation into the United States of any alien woman or girl for the purpose of prostitution, or for any other immoral purpose, is hereby forbidden; and whoever shall, directly or indirectly, import, or attempt to import, into the United States, any alien woman or girl for the purpose of prostitution, or for any other immoral purpose, or whoever shall hold or attempt to hold any alien woman or girl for any such purpose in pursuance of such illegal importation, or *whoever shall keep, maintain, control, support, or harbor in any house or other place, for the purpose of prostitution, or for any other immoral purpose, any alien woman or girl, within three years after she shall have entered the United States, shall, in every such case, be deemed guilty of a felony, and on conviction thereof be imprisoned not more than five years and pay a fine of not more than five thousand dollars;* and any alien woman or girl who shall be found an inmate of a house of prostitution or practicing prostitution, at any time within three years after she shall have entered the United States, shall be deemed to be unlawfully within the United States, and shall be deported as provided by sections twenty and twenty-one of this act."

The plaintiffs in error were indicted for a violation of this section, the charge against them being based upon that portion of the section which is in italics, and in terms that they "wilfully and knowingly did keep, maintain, control, support and harbor in their certain house of prostitution " (describing it) " for the purpose of prostitution a certain alien woman, to wit, Irene Bodi," who was, as they well knew, a subject of the

King of Hungary, who had entered the United States within three years. A trial was had upon this indictment; the plaintiffs in error were convicted and sentenced to the penitentiary for eighteen months.

*Mr. Benjamin C. Bachrach,* with whom *Mr. Elijah N. Zoline* was on the brief, for plaintiffs in error:

The power to regulate vice and morality within the confines of a State is exclusively within the police power of the particular State and Congress has no power to pass laws of this nature affecting persons within the confines of any State. The police power of the State was never surrendered to the Federal Government. It is reserved to the State to be exercised by it in regulating and directing its internal affairs. *King* v. *Am. Transp. Co.,* 14 Fed. Cas. 512.

A State cannot divest itself of police power; this power is essential to its very existence, and it can neither surrender, abandon or barter it away.

All the powers of our National Government are powers delegated to it by the States, and the powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.

Within the confines of a State of the United States there is no warrant for the exercise of such authority by the Federal Government, and the Federal Government has no such authority within the territory and jurisdiction of a State and over citizens of such State. Within the confines of the State the police power in its broadest and fullest extent exists and operates under state control. It can be invoked without Federal consent, and modified or relaxed without Federal interference. This power is inherent in the State. It finds its field of operation confined within the limits of its territorial jurisdiction. Whenever the Federal Government assumes to exercise police power within the confines of a State it invades the exclusive province and right of the State.

The state law reaches out and punishes offenses of the nature

embraced in this clause of the act of Congress of February 20, 1907. Under the police power of the State the State has ample authority to deal with the matter in such way as it may deem necessary and adequate, and the Federal Government has no power and no authority, corrective or visitorial, over the policy of the State in matters of police.

An alien after landing becomes amenable to the laws of the State in which he resides. Its police power reaches out and stretches around him to punish or protect him just the same as it does over a citizen. The laws of the State where he resides are invoked for his protection and for his punishment. The Federal laws have to do with his entering this country, but once he is admitted their application and operation terminates. Under the Federal law he may be deported for cause, yet to no punishment provided by Federal law can he be subjected for criminal acts committed within and punished by the State. Under the state law he must be tried and punished for his offense, the same as a citizen would be.

Upon the question of the power of Congress to enact the provisions herein in question, see *McCullough* v. *Maryland,* 4 Wheat. 405; *Houston* v. *Moore,* 5 Wheat. 48; *The Civil Rights Cases,* 109 U. S. 3; *The License Cases,* 5 How. 576; *Gibbons* v. *Ogden,* 9 Wheat. 203; *King et al.* v. *American Transp. Co.,* 14 Fed. Cas. 513; *Passenger Case,* 7 How. 283; *Township of Pine Grove* v. *Talcott,* 19 Wall. 666; *City of New York* v. *Miln,* 11 Pet. 139; *United States* v. *DeWitt,* 9 Wall. 41; *Slaughter House Cases,* 6 Wall. 64; *Patterson* v. *Kentucky,* 97 U. S. 503; *United States* v. *Knight,* 156 U. S. 11; *In re Rahrer,* 140 U. S. 555.

*Mr. Assistant Attorney General Fowler* for defendant in error:

The general powers of Congress with reference to aliens have been repeatedly declared by this court. *Turner* v. *Williams,* 194 U. S. 289; *Fong Yue Ting* v. *United States,* 149 U. S. 708; *Lees* v. *United States,* 150 U. S. 476, 480; *United States* v. *Bitty,* 208 U. S. 393.

The validity of the clause in question should be maintained because it relates to and materially affects the importation of the class of women mentioned therein.

The provisions in question did not appear in the act of March 3, 1903, 32 Stat. 1214, and manifestly Congress ascertained that, owing to the many subterfuges resorted to by those interested in the importation of women and girls for the purpose of prostitution and other immoral purposes, it was necessary to make it conclusive evidence that the importation was for such immoral purpose as she might be found engaged in within three years after her entry, and that he who might be found keeping her for an immoral purpose within such time, should be deemed to do so in pursuance of an unlawful importation. Viewed in that light, the provision is not at all unreasonable, and is most salutary in its restraint upon the importation of women and girls for such purposes; because it would be a comparatively easy matter to cover up an arrangement with a female that she come to the United States for an immoral purpose, and have her imported in such manner that it would be practically impossible for the object of the importation to be ascertained; while, if she is prohibited from engaging in such business, and all persons be prohibited from keeping her for such purpose for three years after her arrival, the inducement to procure alien females for immoral purposes would be destroyed.

The clause in question should be held valid because it relates to and materially affects the conditions upon which an alien female may be permitted to remain in this country, and the grounds which warrant her exclusion.

The admission of an alien female under this act may be regarded as only conditional, and for three years she is on probation; and, if within that time she be guilty of the acts therein mentioned, she forfeits her right to remain. And it is certainly within the power of Congress to provide a punishment for those who thus bring about her expulsion.

The validity of the provision in question should be deter-

mined from its general effect upon the importation and exclusion of aliens.

The question is, Do its provisions, and the fact that those who are guilty of such conduct as that for which plaintiffs in error have been convicted may be prosecuted in the United States courts, materially reduce the importation of females for immoral purposes, and thus restrain an evil with reference to which it has been universally held that Congress has the power to legislate? If they do, then this provision falls within the purview of congressional legislation, and is valid, notwithstanding the fact that the State has, in the exercise of its reserved powers, the right to punish plaintiffs in error for the same conduct.

There is nothing antagonistic or conflicting in the existence of these dual punishments for the same acts, inasmuch as they constitute two distinct offenses, the one against the state government and the other against the National Government; and the right of each of these two governments to inflict punishment for the same act has repeatedly been recognized by this court. *Moore* v. *The People*, 14 How. 14; 20; *Coleman* v. *Tennessee*, 97 U. S. 509; *Grafton* v. *United States*, 206 U. S. 333, 354. See also *United States* v. *Coombs*, 12 Pet. 71; *United States* v. *Marigold*, 9 How. 560, 568; *United States* v. *Bridleman*, 7 Fed. Rep. 894; *United States* v. *Holiday*, 3 Wall. 407.

MR. JUSTICE BREWER, after making the foregoing statement, delivered the opinion of the court.

The single question is one of constitutionality. Has Congress power to punish the offense charged, or is jurisdiction thereover solely with the State? Undoubtedly, as held, "Congress has the power to exclude aliens from the United States; to prescribe the terms and conditions on which they may come in; to establish regulations for sending out of the country such aliens as have entered in violation of law, and to commit the enforcement of such conditions and regulations to executive

officers." *Turner* v. *Williams,* 194 U. S. 279, 289.  See also *Fong Yue Ting* v. *United States,* 149 U. S. 698, 708; *Head Money Cases,* 112 U. S. 580, 591; *Lees* v. *United States,* 150 U. S. 476, 480; *United States* v. *Bitty,* 208 U. S. 393.

It is unnecessary to determine how far Congress may go in legislating with respect to the conduct of an alien while residing here, for there is no charge against one; nor to prescribe the extent of its power in punishing wrongs done to an alien, for there is neither charge nor proof of any such wrong.  So far as the statute or the indictment requires, or the testimony shows, she was voluntarily living the life of a prostitute, and was only furnished a place by the defendants to follow her degraded life.  While the keeping of a house of ill-fame is offensive to the moral sense, yet that fact must not close the eye to the question whether the power to punish therefor is delegated to Congress or is reserved to the State.  Jurisdiction over such an offense comes within the accepted definition of the police power.  Speaking generally, that power is reserved to the States, for there is in the Constitution no grant thereof to Congress.

In *Patterson* v. *Kentucky,* 97 U. S. 501, 503, is this declaration:

" 'In the American constitutional system,' says Mr. Cooley, 'the power to establish the ordinary regulations of police has been left with the individual States, and cannot be assumed by the national government.'  Cooley, Const. Lim. 574.  While it is confessedly difficult to mark the precise boundaries of that power, or to indicate, by any general rule, the exact limitations which the States must observe in its exercise, the existence of such a power in the States has been uniformly recognized in this court.  *Gibbons* v. *Ogden,* 9 Wheat. 1; *License Cases,* 5 How. 504; *Gilman* v. *Philadelphia,* 3 Wall. 713; *Henderson* v. *Mayor of the City of New York,* 92 U. S. 259; *Railroad Company* v. *Husen,* 95 U. S. 465; *Beer Company* v. *Massachusetts,* 97 U. S. 25.  It is embraced in what Mr. Chief Justice Marshall in *Gibbons* v. *Ogden,* calls that 'immense mass

of legislation,' which can be most advantageously exercised by the States, and over which the national authorities cannot assume supervision or control."

And in *Barbier* v. *Connolly*, 113 U. S. 27, 31, it is said:

"But neither the amendment—broad and comprehensive as it is—nor any other amendment, was designed to interfere with the power of the State, sometimes termed its police power, to prescribe regulations to promote the health, peace, morals, education and good order of the people, and to legislate so as to increase the industries of the State, develop its resources, and add to its wealth and prosperity."

Further, as the rule of construction, Chief Justice Marshall, speaking for the court in the great case of *McCulloch* v. *Maryland*, 4 Wheat. 316, 405, declares:

"This Government is acknowledged by all to be one of enumerated powers. The principle that it can exercise only the powers granted to it would seem too apparent to have required to be enforced by all those arguments which its enlightened friends, while it was depending before the people, found it necessary to urge. That principle is now universally admitted. But the question respecting the extent of the powers actually granted is perpetually arising, and will probably continue to arise, as long as our system shall exist."

In *Houston* v. *Moore*, 5 Wheat. 1, 48, Mr. Justice Story says:

"Nor ought any power to be sought, much less to be adjudged, in favor of the United States, unless it be clearly within the reach of its constitutional charter. Sitting here, we are not at liberty to add one jot of power to the National Government beyond what the people have granted by the Constitution." Art. X of Amendments; *City of New York* v. *Miln*, 11 Pet. 102, 133; *License Cases*, 5 How. 504, 608, 630; *United States* v. *Dewitt*, 9 Wall. 41, 44; *Patterson* v. *Kentucky*, 97 U. S. 501, 503; *Barbier* v. *Connolly*, 113 U. S. 27, 31; *In re Rahrer*, 140 U. S. 545, 555; *United States* v. *Knight*, 156 U. S. 1, 11; Cooley's Constitutional Limitations, 574.

Doubtless it not infrequently happens that the same act

may be referable to the power of the State, as well as to that of Congress. If there be collision in such a case, the superior authority of Congress prevails. As said in *City of New York* v. *Miln*, 11 Pet. 102, 137:

"From this it appears that whilst a State is acting within the legitimate scope of its power as to the end to be attained, it may use whatsoever means, being appropriate to that end, it may think fit; although they may be the same, or so nearly the same, as scarcely to be distinguishable from those adopted by Congress acting under a different power, subject only, say the court, to this limitation, that in the event of collision, the law of the State must yield to the law of Congress. The court must be understood, of course, as meaning that the law of Congress is passed upon a subject within the sphere of its power."

In *Gulf, Colorado & Santa Fe Railway* v. *Hefley*, 158 U. S. 98, 104, the rule is stated in these words:

"Generally it may be said in respect to laws of this character that, though resting upon the police power of the State, they must yield whenever Congress, in the exercise of the powers granted to it, legislates upon the precise subject-matter, for that power, like all other reserved powers of the States, is subordinate to those in terms conferred by the Constitution upon the nation. 'No urgency for its use can authorize a State to exercise it in regard to a subject-matter which has been confided exclusively to the discretion of Congress by the Constitution.' *Henderson* v. *New York*, 92 U. S. 259, 271. 'Definitions of the police power must, however, be taken subject to the condition that the State cannot, in its exercise, for any purpose whatever, encroach upon the powers of the General Government, or rights granted or secured by the supreme law of the land.' *New Orleans Gas Co.* v. *Louisiana Light Co.*, 115 U. S. 650, 661. 'While it may be a police power in the sense that all provisions for the health, comfort, and security of the citizens are police regulations, and an exercise of the police power, it has been said more than once in this court that, where such powers are so exercised as to come within the domain of Federal authority as defined

by the Constitution, the latter must prevail.' " *Morgan* v. *Louisiana,* 118 U. S. 455, 464.   See also *Lottery Case,* 188 U. S. 321.

The question is, therefore, whether there is any authority conferred upon Congress by which this particular portion of the statute can be sustained.   By § 2 of Art. II of the Constitution, power is given to the President, by and with the advice and consent of the Senate, to make treaties, but there is no suggestion in the record or in the briefs of a treaty with the King of Hungary under which this legislation can be supported.

The general power which exists in the Nation to control the coming in or removal of aliens is relied upon, the Government stating in its brief these two propositions:

"The clause in question should be held valid because it relates to and materially affects the conditions upon which an alien female may be permitted to remain in this country, and the grounds which warrant her exclusion.

   \*    \*    \*    \*    \*    \*    \*    \*

"The validity of the provision in question should be determined from its general effect upon the importation and exclusion of aliens."

But it is sufficient to say that the act charged has no significance in either direction.

As to the suggestion that Congress has power to punish one assisting in the importation of a prostitute, it is enough to say that the statute does not include such a charge; the indictment does not make it, and the testimony shows, without any contradiction, that the woman, Irene Bodi, came to this country in November, 1905; that she remained in New York until October, 1907; then came to Chicago and went into the house of prostitution which the defendants purchased in November, 1907, finding the woman then in the house; that she had been in the business of a prostitute only about ten or eleven months prior to the trial of the case in October, 1908, and that the defendants did not know her until November, 1907.  In view of those facts the question of the power of Congress to punish

those who assist in the importation of a prostitute is entirely immaterial.

The act charged is only one included in the great mass of personal dealings with aliens. It is her own character and conduct which determines the question of exclusion or removal. The acts of others may be evidence of her business and character. But it does not follow that Congress has the power to punish those whose acts furnish evidence from which the Government may determine the question of her expulsion. Every possible dealing of any citizen with the alien may have more or less induced her coming. But can it be within the power of Congress to control all the dealings of our citizens with resident aliens? If that be possible, the door is open to the assumption by the National Government of an almost unlimited body of legislation. By the census of 1900 the population of the United States between the oceans was in round numbers 76,000,000. Of these, 10,000,000 were of foreign birth, and 16,000,000 more were of foreign parentage. Doubtless some have become citizens by naturalization, but certainly scattered through the country there are millions of aliens. If the contention of the Government be sound, whatever may have been done in the past, however little this field of legislation may have been entered upon, the power of Congress is broad enough to take cognizance of all dealings of citizens with aliens. That there is a moral consideration in the special facts of this case, that the act charged is within the scope of the police power, is immaterial, for, as stated, there is in the Constitution no grant to Congress of the police power. And the legislation must stand or fall according to the determination of the question of the power of Congress to control generally dealings of citizens with aliens. In other words, an immense body of legislation, which heretofore has been recognized as peculiarly within the jurisdiction of the States, may be taken by Congress away from them. Although Congress has not largely entered into this field of legislation, it may do so, if it has the power. Then we should be brought face to face with such a change in the internal conditions of this country

as was never dreamed of by the framers of the Constitution. While the acts of Congress are to be liberally construed in order to enable it to carry into effect the powers conferred, it is equally true that prohibitions and limitations upon those powers should also be fairly and reasonably enforced. *Fairbank* v. *United States,* 181 U. S. 283. To exaggerate in the one direction and restrict in the other will tend to substitute one consolidated government for the present Federal system. We should never forget the declaration in *Texas* v. *White,* 7 Wall. 700, 725, that "the Constitution, in all its provisions, looks to an indestructible Union, composed of indestructible States."

> *The judgments are reversed, and the cases remanded to the District Court of the United States for the Northern District of Illinois with instructions to quash the indictment.*

MR. JUSTICE HOLMES, dissenting.

For the purpose of excluding those who unlawfully enter this country Congress has power to retain control over aliens long enough to make sure of the facts. *Yamataya* v. *Fisher (Japanese Immigrant Case),* 189 U. S. 86. To this end it may make their admission conditional for three years. *Pearson* v. *Williams,* 202 U. S. 281. If the ground of exclusion is their calling, practice of it within a short time after arrival is or may be made evidence of what it was when they came in. Such retrospective presumptions are not always contrary to experience or unknown to the law. *Bailey* v. *Alabama,* 211 U. S. 452, 454. If a woman were found living in a house of prostitution within a week of her arrival, no one, I suppose, would doubt that it tended to show that she was in the business when she arrived. But how far back such an inference shall reach is a question of degree like most of the questions of life. And, while a period of three years seems to be long, I am not prepared to say, against the judgment of Congress, that it is too long.

The statute does not state the legal theory upon which it was enacted. If the ground is that which I have suggested, it is fair

to observe that the presumption that it creates is not open to rebuttal. I should be prepared to accept even that, however, in view of the difficulty of proof in such cases. Statutes of which the justification must be the same are familiar in the States. For instance, one creating the offense of being present when gaming implements are found, *Commonwealth* v. *Smith*, 166 Massachusetts, 370, 375, 376, or punishing the sale of intoxicating liquors without regard to knowledge of their intoxicating quality, *Commonwealth* v. *Hallett*, 103 Massachusetts, 452, or throwing upon a seducer the risk of the woman turning out to be married or under a certain age. *Commonwealth* v. *Elwell*, 2 Met. 190; *Reg.* v. *Prince*, L. R. 2 C. C. 154. It is true that in such instances the legislature has power to change the substantive law of crimes, and it has been thought that when it is said to create a conclusive presumption as to a really disputable fact, the proper mode of stating what it does, at least as a general rule, is to say that it has changed the substantive law. 2 Wigmore, Ev., §§ 1353 *et seq.* This may be admitted without denying that considerations of evidence are what lead to the change. And if it should be thought more philosophical to express this law in substantive terms, I think that Congress may require, as a condition of the right to remain, good behavior for a certain time, in matters deemed by it important to the public welfare and of a kind that indicates a preëxisting habit that would have excluded the party if it had been known. Therefore I am of opinion that it is within the power of Congress to order the deportation of a woman found practicing prostitution within three years.

If Congress can forbid the entry and order the subsequent deportation of professional prostitutes, it can punish those who coöperate in their fraudulent entry. "If Congress has power to exclude such laborers . . . it has the power to punish any who assist in their introduction." That was a point decided in *Lees* v. *United States*, 150 U. S. 476, 480. The same power must exist as to coöperation in an equally unlawful stay. The indictment sets forth the facts that constitute such coöperation

and need not allege the conclusion of law. On the principle of the cases last cited, in order to make its prohibition effective the law can throw the burden of finding out the fact and date of a prostitute's arrival from another country upon those who harbor her for a purpose that presumably they know in any event to be contrary to law. Therefore, while I have admitted that the time fixed seems to me to be long, I can see no other constitutional objection to the act, and, as I have said, I think that that one ought not to prevail.

MR. JUSTICE HARLAN and MR. JUSTICE MOODY concur in this dissent.