## MADISON COAL CORPORATION v. STULLKEN.

(Circuit Court of Appeals, Seventh Circuit. October 13, 1915.)

### No. 2189.

1. APPEAL AND ERROR ☞1001—REVIEW—VERDICT.
    Where, in an action for the death of an employé the jury has found that defendant was negligent, their verdict can be reviewed by an appellate court only to ascertain whether there is any evidence to sustain it.
    [Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3922, 3928–3934; Dec. Dig. ☞1001.]

2. MASTER AND SERVANT ☞278—ACTION FOR DEATH OF MINE EMPLOYÉ—SUFFICIENCY OF EVIDENCE.
    In an action for the death of a coal miner, who was killed by the falling of the roof of the room in which he was working after the firing of a shot, there was uncontradicted testimony that the room was examined the night before by a licensed mine examiner, as required by the state statute,

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

and that he found the roof safe; also that it was examined in the morning by the decedent before going to work. *Held*, that there was no evidence of any negligence on the part of the mining company which rendered it liable for the death of decedent.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 954, 956–958, 960–969, 971, 972, 977; Dec. Dig. ☞278.]

In Error to the District Court of the United States for the Southern Division of the Southern District of Illinois; Hon. J. Otis Humphrey, Judge.

Action at law by George C. Stullken, administrator of the estate of Anton Pekar, deceased, against the Madison Coal Corporation. Judgment for plaintiff, and defendant brings error. Reversed.

Plaintiff in error will be hereinafter designated as defendant and defendant in error as plaintiff. Plaintiff's intestate, herein termed the decedent, was killed while working in defendant's coal mine. Suit was instituted by plaintiff, and judgment for $3,000 recovered, to reverse which judgment the present writ of error was sued out.

Defendant owned and operated a coal mine near the village of Glen Carbon, in Madison county, Ill. Decedent was employed in the mine as a shooter and loader; that is, it was his duty to shoot or blast the bedded coal, and then load it into the truck or car provided for that purpose. The declaration contains two counts, the first of which is based upon the Illinois mines and mining act, and charges a willful violation thereof by defendant, in that defendant willfully failed to provide a certificated mine examiner, who within 12 hours preceding the 11th day of October, 1912, visited and inspected said room in said mine, and inscribed on the walls of said room the month and day of inspection and placed a mark on the said dangerous place in the roof of said room, etc., which dangerous condition of said room was known to defendant through its said mine examiner; that the rock, slate, clod, etc., composing said roof was loose and liable to fall; that by reason of defendant's willful violation of said act decedent was permitted, notwithstanding, to enter said room to, and did, work in the scope of his employment, and while so engaged was, by reason of such negligence, killed by the falling of said loose mass of slate, etc. The second count is predicated upon negligence at common law of defendant in failing to furnish decedent a reasonably safe place in which to work.

Under the Illinois mining act the mine manager was required to have the mine examined by a certificated mine examiner within 12 hours preceding every day upon which the mine was to be operated. This mine examiner was required to mark on some suitable place on the walls, other than the face of the coal wall, the day and month of his examination, and, in case dangerous places were found, to place a conspicuous notice of that fact at such place. He was then to make a daily record in a book kept for that purpose. The miner, by section 23, is required to sound and thoroughly examine the roof of his working place before commencing work. If he finds dangerous places, he is not to work there, except to make those places safe. He is required to properly prop and secure his place for his own safety with materials provided for that purpose. A right of action is given for injuries received by reason of a willful violation of the act by the owner. The statute further provides for the application of the provisions of the so-called workmen's compensation act, whereby, if an employé elects to accept the terms of that act and the employer does not, then, in cases like the present one, the defenses of assumed risk, negligence of fellow servant, and contributory negligence are not available, save that the last named may be considered by the jury in reducing damages. Plaintiff did, and defendant did not, elect to take the benefit of that act.

On the day of the accident decedent entered room 5, twentieth stub entry,

first west south, of said mine, at about 7 o'clock in the morning, together with his son Albert, who, in mining parlance, was termed his "buddy." The two had worked in this room 5 for four days prior to October 11, 1912, the day of the death. As was his duty under the statute, decedent, according to the testimony of Albert, tested the roof of the room, which was approximately 7 feet high, by striking it with a pick, including the part which afterwards fell, just before beginning his work in the morning. Albert says "it sounded a little bit loose to me," referring to the test of the portion which fell. Thereafter these two, finding no danger sign, proceeded to shoot the face of the coal. The body of the coal was undercut with a punching machine, leaving an opening under the wall to be shot. Then the face of the mass was divided into six or seven so-called "boards," so that one board might be shot out at a time. Holes were drilled in these sections, and two pounds of powder placed in each. The first hole was shot off by means of a short fuse. While the room was still full of smoke, so that he could hardly see, Albert returned to fire the second shot. He called his father, who had gone into room 6, back to No. 5, to hold a carbide lamp, in order that he might see to fire the second shot. After the second fuse was lighted, and before the shot went off, Albert ran to the opening, he says, and in so doing passed his father, standing in the fatal spot, about 18 feet from the face of the coal. Just after he had passed him, the mass of slate, etc., fell and crushed decedent. He returned and tried to lift the mass of stone off of him, but could not, and then ran for safety. After the explosion he procured help and released his father, but found him already dead. After the second shot the room floor was found to be strewn with chunks of coal, other débris, and broken timbers. Albert says this was the result of the second shot.

Murray, a licensed mine examiner, testified that he had examined the room in which the accident occurred the night before using his so-called sounding rod; that he had tested the roof thereof and found it to be solid and safe, and had placed the figures "10/11," meaning October 11, 1912, upon the wall of the room, and had made his report in the book provided for that purpose as required by the statute. He found no bad place, and consequently posted no warning notice or mark. Lee King, employed as a so-called face boss, testified that he went into said room 5 at about 2 o'clock p. m. of the day of the accident and about 45 minutes before it happened. It was his duty to examine the room, and he did so. He tested the walls, and found them safe, and proceeded to mark off a cross-cut. When closely cross-examined, neither he nor Murray would swear that they remembered testing the particular spot from which the fatal mass fell, but both declared themselves morally certain that they did. Room 5 was about 30 feet wide across the face of the coal and more than 18 feet deep. The record does not disclose its exact area, but the roof was of considerable extent. They both are sure they tested all of it with their sounding or examining rods.

The suit was instituted in the state court and removed to the District Court. No exception was taken to the instructions of the court, save as to so much thereof as assumed the validity of the workmen's compensation act aforesaid. The court submitted to the jury the following special interrogatory: "Do you find from the evidence that the mine of the defendant was examined by a duly licensed mine examiner, and did the mine examiner file a report that the mine was safe for work on the morning of the 11th day of October, 1912?" to which the jury made answer, "No." To this answer defendant excepted.

For errors, defendant assigned that the verdict was contrary to the law and the evidence respectively; that the court refused to instruct the jury at the close of plaintiff's evidence, and again at the close of all the evidence, to find defendant not guilty; that the court refused to instruct the jury to disregard each of the counts of the declaration at the conclusion of the evidence of plaintiff, and again at the conclusion of all the evidence; that the court held the Illinois workmen's compensation act to be constitutional. Other errors are assigned, covering features of the compensation act referred to in the judge's charge, to which no exception was saved. Further facts appear in the opinion.

C. H. Burton, of Edwardsville, Ill., for plaintiff in error.

Geers & Geers, of Edwardsville, Ill., for defendant in error.

Before BAKER, KOHLSAAT, and MACK, Circuit Judges.

KOHLSAAT, Circuit Judge (after stating the facts as above). [1] The jury having found the defendant guilty of negligence as charged in both of the counts of the declaration, it remains only for the court to determine from the record whether there was evidence produced sufficient to sustain the verdict. It is not our duty to weigh the evidence. That is for the jury. Express Co. v. Ware, 20 Wall. 545, 22 L. Ed. 422; N. Y. L. E. & W. R. R. Co. v. Estill Leonard, 147 U. S. 617, 13 Sup. Ct. 444, 37 L. Ed. 292; Dower v. Richards, 151 U. S. 658–663, 14 Sup. Ct. 452, 38 L. Ed. 305.

[2] It is clear from the evidence that the room 5 was inspected by Inspector Murray on the night preceding the accident and marked as aforesaid. There is no evidence to the contrary, while the evidence that such inspection was had is clear and convincing. There was no attempt to examine the roof or walls between the shots, nor any evidence as to the effect thereon of the first shot. Indeed, the room seems to have been too full of smoke to have made possible any inspection by decedent or his son. The statute only required the owner to have the mine inspected on the preceding evening. There is nothing to show what changes took place between the time of inspection and the time of the accident. The first shot may have loosened the mass. There was no visible sign of the dangerous condition. In Wilkins v. Madison Coal Corporation, abstracted in 188 Ill. App. 416, decided July 28, 1914, by the Appellate Court of the Fourth District of Illinois, it is said:

"It is contended by counsel for appellee that a dangerous condition did in fact exist, and the mere fact that the examiner did not ascertain it would not excuse appellant from liability. This is probably true as a legal proposition, if such physical facts were disclosed as ought to have caused the mine examiner to see the danger, and that in passing upon the dangerous condition his judgment was at fault and failed to appreciate the danger that the physical facts indicated. We do not understand that, if there are no physical facts indicating a dangerous or unsafe condition, the appellant could be made liable simply because it afterwards turned out that a latent danger, not discoverable, really existed and an injury resulted therefrom."

In the present case, the inspection having been made in accordance with the statute, the burden was on plaintiff to show that in fact the roof in question was defective and that such defect was discoverable to one using due care and diligence. Practically the only question presented is: Was the roof of the mine in a safe condition when the examiner had finished testing the same, or, if not, was the defect such, at the place where the mass fell, that it could, by the use of due care and diligence on the part of the examiner, have been detected? Certainly the facts of the fall of the slate and the consequent death of decedent do not make out a case of negligence. Granting that the evidence is sufficient to show that on the next morning, and approximately 12 hours after the inspection, the roof at the place where the slate, etc., fell down, "sounded a little loose" to Albert, the time intervening

the inspection and the testing by.decedent is not accounted for either by any fact evidence or by testimony of experts (see Walsh v. W. P. Rend Collieries Co., infra, at this term) to the effect that the conditions existing on the morning of the accident would or would not indicate that there was a patent defect when the examiner made his examination the previous evening. And the jury cannot substitute for evidence a conjecture or a "retrospective presumption." Keller v. United States, 213 U. S. 138, 29 Sup. Ct. 470, 53 L. Ed. 737, 16 Ann. Cas. 1066. If the roof had become dangerous after inspection, as may have been the case, so far as the evidence discloses, then it became the duty of decedent to have discovered the danger and to have protected himself from accident thereby. He was a miner of 32 years' standing, and must be presumed to have appreciated the danger of a place in the roof which sounded loose. We can conceive of no reasonable method defendant could have adopted to secure the decedent against accident better calculated to attain that end than that which was provided in the present case. Nor are we able to discover from the record any negligence on its part in the premises. Therefore we are constrained to hold that both the general and the special verdicts are unsupported by the evidence.

The judgment of the District Court is reversed, with direction to grant a new trial.