**Jose Antonio Santin RAMOS, suing by his father, Manuel Benito Santin Arias, Plaintiffs,**

v.

**UNITED STATES CIVIL SERVICE COMMISSION et al., Defendants.**

**Jose Joaquin Cabrera GOMEZ, Plaintiff,**

v.

**Hon. Earl L. BUTZ, Secretary of Agriculture of the United States Government, Defendant.**

**Civ. Nos. 63–73, 326–73.**

United States District Court,
D. Puerto Rico.

May 29, 1974.

**362**

Santos P. Amadeo, Rio Piedras, P. R., for plaintiffs.

Julio Morales-Sanchez, U. S. Atty., San Juan, P. R., for defendants.

1. Title 5, C.F.R., § 338.101, provides,
   "(a) A person may be admitted to competitive examination only if he is a citizen of or owes permanent allegiance to the United States.
   (b) A person may be given appointment only if he is a citizen of or owes allegiance to the United States . . . . "

2. Each fiscal year one or more appropriations bill contains a provision prohibiting the expenditure of funds for the employment of aliens except in stated cases. The provision is currently found in the Treasury, Postal

Before CAMPBELL, Circuit Judge, and TOLEDO and PESQUERA, District Judges.

## OPINION

LEVIN H. CAMPBELL, Circuit Judge.

The question presented by these two cases is whether the federal government may exclude aliens admitted to permanent residence from opportunities open to citizens even though a state, under Sugarman v. Dougall, 413 U.S. 634, 93 S.Ct. 2842, 37 L.Ed.2d 853 (1973), and related authorities, would now be forbidden to practice similar discrimination.

Jose Antonio Santin Ramos is, the parties stipulate, an 18 year old native of the Republic of Cuba, legally admitted to the United States in 1962 and now residing in Puerto Rico. He is not a United States citizen. Responding to an announcement issued by the United States Civil Service Commission (CSC) advertising job opportunities for technical aid positions in federal agencies throughout Puerto Rico and the Virgin Islands, he took a written test at the San Juan area office. Having passed the test, he applied for a position as Control Tower Operator Trainee, but was notified that he could not be considered for appointment to the competitive Civil Service because CSC regulation 5 C.F.R. § 338.101 [1] makes citizenship a qualification for appointment.

He seeks in this suit a declaration that 5 C.F.R. § 338.101, and the statute on which it is allegedly based,[2] are un-

Service and General Government Appropriation Act of 1973, P.L. 92–351. Section 601 of this act provides:
"Unless otherwise specified and during the current fiscal year, no part of any appropriation contained in this or any other Act shall be used to pay the compensation of any officer or employee of the Government of the United States . . . whose post of duty is in continental United States unless such person (1) is a citizen of the United States . . ."
The parties agree that the exceptions in the Act, for persons who "owe allegiance" to the

constitutional, and requests an injunction against their further enforcement. After the CSC protested that the suit at most attacked a regulation and therefore did not require the convening of a three-judge court, Santin Ramos amended his complaint to state that "he is willing and shall accept appointment" in the sought-for position anywhere in the continental United States, but was unable to take an examination for such employment, or to be offered such employment, because of both 5 C.F.R. § 338.101 and the statutory prohibition on the employment of aliens.

Jose Joaquin Cabrera Gomez is a native of the Republic of Cuba, admitted to permanent residence in the United States and residing in Puerto Rico. He is not a United States citizen. He is married to Ana Elisa Diaz, an American citizen. According to his complaint and the admissions in the answer, Cabrera Gomez and his wife jointly operate a cattle raising farm in the municipality of Ciales. As the result of a severe drought the cattle herd was decimated. The Secretary of Agriculture had, because of the drought, designated the area as a disaster area pursuant to 7 U. S.C. § 1961,[3] which provides for disaster loans on favorable terms to farmers who are citizens of the United States. When Cabrera Gomez applied for a loan, his application was refused on the ground that he is not a citizen. Although consideration was given to making the loan

to his wife, that alternative was rejected because, although she is a citizen, an alien would receive substantial benefit from the loan in apparent violation of the statute. See FHA Instruction 441.-2.[4] Cabrera Gomez thereupon sought a declaration that the statute is unconstitutional and an injunction against its further enforcement.

A three-judge court was requested pursuant to 28 U.S.C. § 2282 and was convened. Both cases have been submitted for decision on the basis of the stipulated or admitted facts.

## I

■ We first consider the government's contention that Santin Ramos' claim is outside the jurisdiction of a three-judge court. It asserts that the only barrier to the job he sought was the CSC regulation, § 338.101, and that this may be attacked before a single judge. 28 U.S.C. § 2282. See Mow Sun Wong v. Hampton, 500 F.2d 1031, at 1032, n. 1, No. 72–1079 (9th Cir. 1974), cert. pending, 42 U.S.L.W. 3612 (No. 73–1596, filed Apr. 24, 1974). The statute he questions, P.L. 92–351, § 601, excludes aliens from jobs in the continental United States only, and thus arguably has no effect in Puerto Rico. But Santin Ramos, in his amended complaint, asserts a willingness to accept the same federal job in the continental United States. This is not a case where

---

United States [administratively construed as residents of American Samoa], aliens from Poland, the Baltic countries, the Philippines, and "countries allied with the United States in the current defense effort", or who are translators or temporary emergency employees, do not include either of the plaintiffs in this case.

3. 7 U.S.C. § 1961 provides in part:
"(a) The Secretary may designate any area in the United States and in Puerto Rico and the Virgin Islands as an emergency area if he finds (1) that there exists in such area a general need for agricultural credit which cannot be met for temporary periods of time by private, cooperative, or other responsible sources . . ., at reasonable rates and terms for loans for similar purposes and periods of time, and (2) that the

need for such credit in such area is the result of a natural disaster.
(b) The Secretary is authorized to make loans in any such area (1) to establish farmers, ranchers, or oyster planters *who are citizens of the United States* . . . ." [Emphasis added.]

4. FHA Instruction 441.2 provides that an applicant for the loans must
"(A) Be a citizen of the United States, if an individual. If a partnership, the individual partners must be citizens of the United States. If a corporation, the corporation must be incorporated under the laws of the United States or any State thereof and the principal stockholders must be citizens of the United States. Any stockholder owning as much as 20 percent of the stock will be considered a principal stockholder."

it is reasonable to require him to prove his diligence by, for example, applying to take an examination for a position in the continental United States. As the regulations forbid the administering of an examination, it would be futile for him to apply. (His taking of the San Juan examination was contrary to the regulations.) *Cf.* Staub v. City of Baxley, 355 U.S. 313, 78 S.Ct. 277, 2 L.Ed.2d 302 (1958). Given the many unitary characteristics of federal employment, his apparent competency for the job, and his willingness to serve on the mainland, we believe his interest to be sufficiently real, as opposed to theoretical, to give him standing to question the statute. *See* United States v. SCRAP, 412 U.S. 669, 688, 689 n. 14, 93 S.Ct. 2405, 37 L. E.2d 254 (1973); Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 152–153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); Scott, Standing in the Supreme Court—A Functional Analysis, 86 Harv.L.Rev. 645, 648–654 (1973).

Nor would it make sense to remand to a single judge for resolution of the attacks on the regulations. *See* Hagans v. Lavine, 415 U.S. 528, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974); Rosado v. Wyman, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970). The attack on the regulations is based on the same constitutional issues that support the attack on the statute; to resolve one is to resolve both. Moreover, the resolution of the regulatory challenges would not fully dispose of the suit; it would still be necessary to reconvene the three-judge court to decide whether it would adopt and apply to the statute (over which the three-judge court alone has jurisdiction) the analysis the single judge had applied to the regulations. Even were we to analyze 5 C.F.R. § 338.101 as it applies to persons working beyond the continental United States, and were we to find it

unauthorized by statute [5] as suggested by Jalil v. Hampton, 148 U.S.App.D.C. 415, 460 F.2d 923 (1972), we would still be required to evaluate the constitutionality of P.L. 92–351, § 601, as it applies to Santin Ramos' request for employment in the continental United States. Because we cannot avoid the constitutional issue by decision of the questions concerning the regulations, *cf.* Siler v. Louisville & N. R. R., 213 U.S. 175, 29 S. Ct. 451, 53 L.Ed. 753 (1909), we proceed directly to the analysis of the constitutionality of the statutory exclusion of aliens.

## II

The restrictions on opportunities for federal employment and federal disaster loans must in large measure stand or fall together. Although each exclusion has its separate justifications, which we discuss in Part III infra, each exclusion is of a sort that has been forbidden to the states. In Sugarman v. Dougall, 413 U.S. 634, 93 S.Ct. 2842, 37 L.Ed.2d 853 (1973), the Supreme Court held that a state could not exclude aliens indiscriminately from access to civil service jobs [6] (although it might still reserve for citizens jobs in which there was a convincing nexus between the job requirements and citizenship). The Court reserved in note 12 the question whether the same result would obtain for federal civil service employment. *Cf.* Espinoza v. Farah Manufacturing Co., 414 U.S. 86, 91 n. 4, 94 S.Ct. 334, 38 L.Ed.2d 287 (1973). Similarly, the states have been forbidden to discriminate against aliens in the granting of welfare benefits by Graham v. Richardson, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971). Agricultural disaster loans are not far removed from welfare. The critical issue is whether the federal government may practice discriminations forbidden to the states. The ninth circuit has already

---

5. We agree with Mow Sun Wong v. Hampton, 500 F.2d 1031, at 1033–1036, No. 72–1079 (9th Cir. Jan. 25, 1974) that the regulations in question here were adequately authorized by statute.

6. *See also* In re Griffiths, 413 U.S. 717, 93 S.Ct. 2851, 37 L.Ed.2d 910 (1973), holding that Connecticut may not exclude aliens from the opportunity to practice law.

answered this question in the negative. Mow Sun Wong v. Hampton, *supra*. We agree with the ninth circuit.

*Graham, Sugarman* and *Griffiths* hold that aliens are sheltered by the Equal Protection Clause of the Fourteenth Amendment, and that

"[C]lassifications based on alienage, like those based on nationality or race, are inherently suspect and subject to close judicial scrutiny. Aliens as a class are a prime example of a 'discrete and insular' minority . . . for whom such heightened judicial solicitude is appropriate."

*Graham, supra* at 372. The Court emphasized that a state using "a suspect classification 'bears a heavy burden of justification,' . . ., a burden which, though variously formulated requires [a] State to . . . show that its purpose or interest is both constitutionally permissible and substantial, and that its use of the classification is 'necessary . . . to the accomplishment' of its purpose or the safeguarding of its interest." *Griffiths, supra* at 721–722.

"Resident aliens, like citizens, pay taxes, support the economy, serve in the armed forces, and contribute in myriad other ways to our society. It is appropriate that a State bear a heavy burden when it deprives them of employment opportunities." *Id.* at 722.

The above cases mark the demise of the doctrine that a state, in doling out scarce commodities such as jobs, may favor citizens over aliens. *See Graham, supra* at 372–374; *Sugarman, supra* at 643–645. Justice Powell traces in *Griffiths* the rise and fall of this doctrine, which had permitted, if it did not encourage, the placing of legal restrictions upon the right of aliens to pursue certain occupations.

Even before *Graham* the Supreme Court had held that aliens were broadly entitled to "the safeguards of the Constitution, and to the protection of the laws, in regard to their rights of person and of property, and to their civil and criminal responsibility." Fong Yue Ting v. United States, 149 U.S. 698, 724, 13 S.Ct. 1016, 1026, 37 L.Ed. 905 (1893). *See* Bridges v. Wixon, 326 U.S. 135, 161, 65 S.Ct. 1443, 89 L.Ed. 2103 (1945) (Murphy, J., concurring), cited with approval in Kwong Hai Chew v. Colding, 344 U.S. 590, 596–597 n. 5, 73 S.Ct. 472, 97 L.Ed. 576 (1953). *Graham, Sugarman* and *Griffiths* are novel only in that they give constitutional standing to employment and welfare rights via the Equal Protection Clause. They establish, as the Court said in *Graham*, quoting from Takahashi v. Fish & Game Comm'n, 334 U.S. 410, 420, 68 S.Ct. 1138, 1143, 92 L.Ed. 1478 (1948):

"The Fourteenth Amendment and the laws adopted under its authority thus embody a general policy that all persons lawfully in this country shall abide 'in any state' on an equality of legal privileges with all citizens under non-discriminatory laws."

We see no way to avoid transferring the enunciated principles to federal employment and federal relief. Before the above-cited trilogy, one might have argued that alienage is quite distinct from race and, therefore, not "suspect": for one thing, an alien admitted to permanent residence may, by diligence, become a citizen. One might have urged that for purposes of government employment it is entirely reasonable to prefer those who are formal members of the body politic over those who are not. But these arguments are surely foreclosed by the Supreme Court's recent decisions, unless fundamental rights are to mean one thing when dealing with a state and another when dealing with the federal government.

It is no answer to say that the Fourteenth Amendment applies only to state action. In Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1953), the Court held that due process of law under the Fifth Amendment included "equal protection" to the extent of prohibiting the federal government from racial discrimination. The Court stressed that classifications based upon

race are "suspect". *Id.* at 499. As classifications based upon alienage are now also "suspect", it would seem that a classification of aliens which, if state-made, violates equal protection will, if federally-made, violate due process.[7] In *Bolling* the Court said, at p. 500,

> "In view of our decision that the Constitution prohibits the states from maintaining racially segregated public schools, it would be unthinkable that the same Constitution would impose a lesser duty on the Federal Government."

By the same token, it would seem unthinkable that "the same Constitution would impose a lesser duty on the Federal Government" in its dealings with lawfully admitted permanent resident aliens—at least in those dealings unrelated to Congress' special responsibilities for naturalization.

Congress, of course, under its Constitutional power to "establish an uniform Rule of Naturalization" may control immigration.[8] Art. I, § 8, cl. 4. In that sense it enjoys a position superior to any state. The Court recognized this superiority in *Graham, supra* at 376–380, as an additional ground for holding that a state might not refuse welfare benefits; it said that such refusal interfered with Congress' exclusive right to admit or exclude aliens. *Id.* at 379.

■ But the general power indiscriminately to deny an alien a federal job or loan is not subsumed under the power to decide whether or when to admit and deport him. Congress' power over naturalization does not entitle it to admit aliens on an express or implied "condition" that they forego the very Constitutional right to equal treatment while here which, in *Takahashi* and *Graham*, the Court said they had. *Cf.* Wong

Wing v. United States, 163 U.S. 228, 16 S.Ct. 977, 41 L.Ed. 140 (1896) (aliens entitled to jury trial before imprisonment.) In Keller v. United States, 213 U.S. 138, 148, 29 S.Ct. 470, 473, 53 L.Ed. 737 (1909), the Court declined to recognize in Congress the power "to control all the dealings of our citizens with resident aliens". In *Graham, supra* at 382, the Court said, in answer to Arizona's argument that the federal government had authorized it to deny welfare benefits to aliens,

> "Although the Federal Government admittedly has broad constitutional power to determine what aliens shall be admitted to the United States, the period they may remain, and the terms and conditions of their naturalization, Congress does not have the power to authorize the individual States to violate the Equal Protection Clause."

We conclude that Congress itself, when legislating generally on matters not related to the furtherance of its naturalization responsibilities, may not single out aliens for discriminatory treatment forbidden to the states. Any other result would lead to a peculiar hierarchy of rules, in which the federal government would enjoy a license to engage in practices condemned by the courts as unfair and discriminatory when done by the states.

### III

■ It remains to apply to the instant cases the rationale discussed above. The government's exclusionary policies in respect to aliens, being "suspect", bear "a heavy burden of justification" and must be shown to further a constitutionally permissible and substantial purpose and to be "necessary" there-

---

7. For the Court's most recent statement concerning the close interrelation of the two Constitutional clauses see Johnson v. Robison, 415 U.S. 361, 94 S.Ct. 1160, 1164, n. 4, 39 L.Ed.2d 389 (1974).

8. Congress may discriminate on racial, national, and occupational lines in deciding

whom to admit to the country. The Chinese Exclusion Case, 130 U.S. 581, 9 S.Ct. 623, 32 L.Ed. 1068 (1889). It may deport aliens arbitrarily or for any or no reason. *See, e. g.,* Galvan v. Press, 347 U.S. 522, 74 S.Ct. 737, 98 L.Ed. 911 (1954); *Cf.* Kleindienst v. Mandel, 408 U.S. 753, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972).

to. *Griffiths, supra* at 721–722. The government has not met its burden in either case.

■ The statutory and regulatory restrictions on employment in the federal civil service are covered by *Sugarman*. *See* Note, Aliens and the Civil Service: A Closed Door?, 61 Geo.L.J. 207 (1972). The arguments supporting federal exclusion are no different from the arguments, held insufficient in *Sugarman*, supporting state exclusion. There is no evidence that all or most of the positions in the competitive civil service from which aliens are excluded are of such a sensitive or specialized or responsible nature that a citizenship limitation is justified. The *Sugarman* court decried the crazy-quilt pattern of New York's discrimination. The federal position is even less supportable because § 601 excludes aliens from all jobs; no attempt is made to draft the exclusion narrowly to encompass only those jobs for which citizenship might be a valid requisite.[9] Nor has the government attempted to demonstrate that the job for which Santin Ramos applied is a position for which citizenship might bear some special relationship to the duties involved. Therefore, to the extent state regulations were struck down in *Sugarman*, the federal statute and regulations must fall also. *See* Mow Sun Wong, *supra* at 13–16; Purdy & Fitzpatrick v. State, 71 Cal.2d 566, 79 Cal.Rptr. 77, 456 P.2d 645 (1969).

The disaster loan program is more troublesome because the justifications advanced by the government in support of the program have not yet been rejected by the Supreme Court. We therefore proceed to examine them seriatim.[10]

The government's first argument is that the congressional debates surrounding the passage of 7 U.S.C. § 1961 demonstrate that Congress was concerned

"By the impoverished condition of the *American* farmer, the depressed *American* economy in general, the scarcity of good agricultural land, and the national concern for a strong and healthy farming community." [Emphasis in original.]

The debates reflect these interests, and many congressmen were intent on confining benefits to citizens[11] because they believed citizens more deserving. However, under this rationale the legislation in question is perilously close to "[d]iscrimination or segregation for its own sake," which, the Court pointed out in In re Griffiths, *supra* at 722 n. 8 (1973), "is not, of course, a constitutionally permissible purpose." Aliens admitted to permanent residence are subject to the same taxes, the same duty of military service, and the same burdens of government in every other respect as are citizens. It has therefore been held uniformly that "there appears to be no logical justification for discrimination against aliens on economic grounds." Mow Sun Wong, *supra* at 14. *See Sugarman, supra* at 645–646; Purdy & Fitzpatrick, *supra* 79 Cal.Rptr. at 88, 456 P.2d 645.

The government's second argument is that aliens are more mobile than the re-

9. We note, as did the *Sugarman* court, that we are not dealing here with policy-making or sensitive positions, where citizenship may be a valid job qualification because participation in the decision-making process of the polity is the very definition of citizenship. *See id.* at 646–649. *Cf.* Perkins v. Smith, 370 F.Supp. 134 (D.Md.1974) (citizenship required for jury service).

10. The government also argues that this suit is barred by sovereign immunity. That contention is without merit. Dugan v. Rank, 372 U.S. 609, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963); Larson v. Domestic & Foreign Commerce Corp., 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949). Our decision here does no more than strike from statutes and regulations clauses that exceed the power of Congress to enact.

11. In many ways it is the farmland itself, and American agricultural output, that is the "beneficiary" of the disaster loan. It is inaccurate to characterize the benefit of the loan as accruing solely to its immediate recipient. If the purpose of the program is to increase agricultural output, the citizenship of the land's owner is irrelevant.

mainder of the population, and that because Congress desired to limit the disaster loans to applicants who had "reasonable prospects of continuing farming operations," it is reasonable to deny loans to aliens. We do not believe that this argument enables the government to carry its burden of showing a compelling interest. It has no support in the legislative history, nor is there any data from which we could conclude that alien farmers are in fact more mobile.[12] Moreover, we note that attributing to Congress a desire to judge the mobility of aliens as a group would produce an apparent inconsistency with the desire expressed in the statute that decisions to extend loans, and evaluations of "risk", be made by the Secretary's designate on a case-by-case basis rather than on the basis of broad categories.

The government's third and final argument is that it is acceptable to exclude aliens from the program because aliens are, as a group, more likely to flee the country (or be deported), thus leaving the United States with no recourse to recover its monies. This argument shares the drawbacks of the "mobility" argument. In addition, to the extent that the loan is secured by the value of the farmland rather than by the debtor's personal promise to pay, it would make little difference to the security of the loan whether or not the debtor fled.

■ Finally, to the extent we attribute to congress a desire to bar all aliens from disaster loans because some aliens might flee, the statute has created an irrebuttable presumption open to attack under the theory of Cleveland Board of Education v. LaFleur, 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974). Whatever may be the scope of the analysis in other areas—and the Supreme Court has yet carefully to define the doctrine or limit its application—the "irrebuttable presumption" cases hold at least that when the government saddles a large class of people with a substantial disability, solely because a few people in the class deserve to be so saddled, then the class has been too broadly defined and the propensity of the few cannot support the disability of the many. Whenever that condition obtains, the categorization is unconstitutional and the legislature must either narrow the class (as the Court in *LaFleur* suggested a narrowing to the class of women eight months pregnant), or the legislature must make the presumption rebuttable and allow any individual show that he does not share the attribute that properly ought to give rise to the disability.

■ If that is the import of *LaFleur*, then Congress could not, based on a belief that a few aliens would flee, deny to all aliens the opportunity for disaster loans. The presumption is particularly harsh here because it sweeps within its preclusion not only all aliens but all of their wives, even though citizens. More justification than has been advanced is needed to support such a deprivation. Under whatever analysis we use, therefore, we cannot find a compelling governmental interest being pursued through the use of the least restrictive means. Both statute and instruction are unconstitutional.

As appropriate injunction and declaration will be entered.

PESQUERA, District Judge (dissenting).

For substantially the reasons stated by Mr. Justice Rehnquist in his opinions in Sugarman v. Dougall, 413 U.S. 634, 93 S.Ct. 2842, 37 L.Ed.2d 853 (1973), and In re Griffiths, 413 U.S. 717, 93 S.Ct. 2851, 37 L.Ed.2d 910 (1973), I find myself in dissent in this case. I find both the court's opinion, and the trend of which it is a part, unfortunate. There have been and will be moments in our

12. Such supporting evidence is particularly important when the government is attempting to sustain a classification based on suspect criteria. *See* Kahn v. Shevin, —— U.S. ——, 94 S.Ct. 1734, 40 L.Ed.2d 189 (1974); Frontiero v. Richardson, 411 U.S. 677, 93 S. Ct. 1764, 36 L.Ed.2d 583 (1973).

national history that have and will demand the very best effort, the highest measure of devotion, from the nation's citizens. I feel a sorrow that the pride, the respect, the attitude that once was shared by the great majority of the Americans towards their citizenship might be fading. Decisions such as *Sugarman, In re Griffiths, Mow Sun Wong* and this one certainly will continue and will accelerate the erosion of our pride in being citizens.