## CHRISTIAN FEIGENSPAN, Inc., v. BODINE, U. S. Atty., et al. *

(District Court, D. New Jersey.　March 9, 1920.)

1. **Constitutional law ⚖═10—Eighteenth Amendment valid.**

Eighteenth Amendment, with respect to its subject-matter, *held* within the power to amend given by article 5, and valid.

2. **States ⚖═4—Amendment of federal Constitution not invalid as diminishing police power of states.**

Every grant of power to the federal government, whether by the Constitution as originally framed or by subsequent amendment, necessarily diminished the powers of the several states, and that an amendment takes away a police power previously in the state does not render it invalid.

3. **Constitutional law ⚖═10—Amendment valid, though provision is not alterable at will of majority of people.**

That a constitutional amendment is in effect legislation controlling the conduct of private individuals, in that it ordains a final permanent law prohibiting certain acts, not alterable at the will of a majority, does not render it invalid.

4. **Constitutional law ⚖═10—Resolution proposing amendment need not express necessity thereof.**

The provision of Const. art. 5, authorizing Congress to propose amendments "whenever two-thirds of both houses shall deem it necessary," does not require that a joint resolution proposing an amendment shall expressly declare that it is deemed necessary.

5. **Constitutional law ⚖═70(1)—Form of resolution proposing amendment not subject to judicial review.**

Congress alone, of all departments of the federal government, is intrusted with the power of proposing amendments to the Constitution, and the form of resolutions by which it proposes an amendment is not subject to judicial investigation.

6. **Constitutional law ⚖═10—Ratification of amendment not affected by state laws providing for referendum; "legislature."**

In Const. art. 5, providing that a proposed amendment shall be valid "when ratified by the Legislatures of three-fourths of the several states," when that mode shall be proposed by Congress, the word "Legislature" means the then recognized representative law-making bodies of the states, and the validity of an amendment ratified by the requisite number of such Legislatures cannot be affected by state laws providing for, or permitting, a referendum vote on legislative acts.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series; Legislature.]

7. **States ⚖═4—Eighteenth Amendment makes congressional legislation paramount without concurrence by states.**

Eighteenth Amendment, § 2, providing that "the Congress and the several states shall have concurrent power to enforce this article by appropriate legislation," must be construed, in harmony with its purpose, to expressly authorize effective legislation for enforcement of section 1, which excludes a construction making concurrence of the states necessary to the effectiveness of congressional legislation, and such legislation, if enacted, is paramount, and, while it may be supplemented by state legislation, it cannot

---

⚖═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

*Decree affirmed 252 U. S. —, 40 Sup. Ct. 486, 64 L. Ed. —.

be defeated by any action or nonaction of the states. In the absence of action by Congress, any state may enact enforcement legislation effective within its borders.

**8. Intoxicating liquors ⬙17—Legislative definition is not arbitrary.**

National Prohibition Act Oct. 28, 1919, § 1, in providing that "intoxicating liquor," as used in the act, shall be construed to include all liquors, liquids, or compounds containing one-half of 1 per centum or more of alcohol by volume, does not make a definition which may be declared arbitrary and unconstitutional by the courts, but one which it was within the reasonable discretion of Congress to make for the purposes of the act.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Intoxicating Liquor.]

**9. Eminent domain ⬙2(1)—National Prohibition Act not invalid as taking property without compensation.**

National Prohibition Act Oct. 28, 1919, *held* not invalid, as taking private property for public use without just compensation, in violation of Fifth Amendment, because, as incidental to the exercise of a lawful power, loss may result to certain species of property.

**10. Constitutional law ⬙10—Meaning of "amendment" in Const. art. 5.**

"Amendment" includes additions to, as well as corrections of, matters already treated, and there is nothing in the context of Const. art. 5, providing that Congress, whenever two-thirds of both houses shall deem it necessary, shall propose amendments, which suggests that it was used in a restricted sense.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Amendment.]

In Equity. Suit by Christian Feigenspan, a corporation, against Joseph L. Bodine, United States Attorney, and Charles V. Duffy, Collector of Internal Revenue. On motions by complainant for preliminary injunction, and by defendants to dismiss. Motion for injunction denied, and motion to dismiss granted.

Harrison P. Lindabury, of Newark, N. J., and Elihu Root and William D. Guthrie, both of New York City, for plaintiff.

Joseph L. Bodine, U. S. Atty., of Trenton, N. J., for defendants.

Wayne B. Wheeler, of Washington, D. C., George S. Hobart, of Jersey City, N. J., and G. Rowland Munroe, of Newark, N. J., amici curiæ.

RELLSTAB, District Judge. The plaintiff, Christian Feigenspan, is a New Jersey corporation authorized by the laws of that state to manufacture and sell lager beer and other malt liquors; the defendant Joseph L. Bodine is the United States attorney of the district of New Jersey; and the defendant Charles V. Duffy is the collector of internal revenue of the revenue district of New Jersey, wherein the plaintiff has its principal place of business.

Generally stated (references of greater detail to appear later on), the bill alleges that plaintiff, the owner of a brewery and its appurtenances, for a number of years prior to August 10, 1917 (the date of the enactment of the act of Congress popularly known as the "Lever Act" [40 Stat. 276, c. 53 [1]]), was actively and extensively engaged in the manufacture and sale of fermented malt liquors for beverage purposes, commercially known as lager beer, ale, and porter;

⬙For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
[1] Comp. St. 1918, Comp. St. Ann. Supp. 1919, §§ 3115⅛e-3115⅛kk, 3115⅛l-3115⅛r.

that on October 28, 1919 (the date of the passage of the act of Congress the short title of which is the "National Prohibition Act" [41 Stat. 305, c. 85]) it had, and still has, on hand a large quantity of nonintoxicating malt liquors containing more than one-half of 1 per cent. of alcohol by volume, but less than 2.75 per cent. by weight, which, in volume, is less than 3.4 per cent., commercially called "war beer," and which it had theretofore lawfully manufactured in the ordinary course of its business, pursuant to the presidential proclamation made under the authority of the "Lever Act"; that, unless enjoined, the defendants, acting under the "National Prohibition Act" (which the plaintiff declares to be unconstitutional), will enforce its provisions against the plaintiff, its agents, and customers, and prevent it from carrying on its business as a manufacturer and vendor of nonintoxicating malt beverages, to its irreparable injury and damage.

The plaintiff prays that the defendants be enjoined from enforcing or attempting to enforce against it, or its agents or customers, any of the penalties, seizures, and forfeitures authorized by the provisions of title 2 of the "National Prohibition Act," for or on account of its "manufacture or sale of nonintoxicating malt beverages."

The cause is before the court on the plaintiff's motion for a preliminary injunction and the motion of the defendants to dismiss the bill. The scope of the allegations of fact and prayer of the bill limits the judicial inquiry on both motions. The questions argued on the hearing of these motions involve the validity of the Eighteenth Amendment to the Constitution of the United States, and of title 2 of the "National Prohibition Act." Broadly stated, the validity of the amendment is challenged on the grounds that it is 1. germane to any of the powers conferred upon the United States or those prohibited to the states, and cannot be added to the United States Constitution by amendment under article V thereof, and that it was neither proposed to the states nor ratified by them in the only way authorized by that article. The invalidity of title 2 of the "National Prohibition Act" is said to exist because it is based on no other authority than the Eighteenth Amendment, which is itself null and void, that the state of New Jersey has not concurred therein, that its definition of intoxicating liquor is arbitrary, and that its forfeiture provisions are confiscatory.

Concerning the defendants' grounds for their motion to dismiss the bill, it is sufficient to say that they assert that the grounds of attack upon the validity of the amendment present nonjusticiable questions, that the National Prohibition Act is valid, and that no equitable ground for the relief prayed for is alleged.

The matter will be considered by taking up the plaintiff's grounds under two heads:

## I. The Alleged Invalidity of the Amendment.

[1] The amendment reads:

"Article 18.

"Section 1. After one year from the ratification of this article the manufacture, sale, or transportation of intoxicating liquors within, the importation thereof into, or the exportation thereof from the United States and all terri-

tory subject to the jurisdiction thereof for beverage purposes, is hereby prohibited.

"Sec. 2. The Congress and the several states shall have concurrent power to enforce this article by appropriate legislation.

"Sec. 3. This article shall be inoperative unless it shall have been ratified as an amendment to the Constitution by the Legislatures of the several states, as provided in the Constitution, within seven years from the date of the submission hereof to the states by the Congress."

The liquor traffic, differing from other kinds of business, has always needed regulating. State after state, beginning several decades ago, has amended its Constitution to prohibit absolutely this business, so that, at the time Congress proposed this amendment to the states for their ratification, more than two-thirds of them had decreed it to be an outlaw. Previous to such submission, in response to persistent demands from the people of those states, Congress, in the exercise of its power to regulate interstate commerce and for the purpose of aiding such states to enforce more effectively their prohibition laws, successively passed laws known as the Wilson Act (Act Aug. 8, 1890, c. 728, 26 Stat. 313 [Comp. St. § 8738]); the Webb-Kenyon Act (Act March 1, 1913, c. 90, 37 Stat. 699 [Comp. St. § 8739]); and the Reed Amendment (Act March 3, 1917, c. 162, § 5, 39 Stat. 1058, 1069 [Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 8739a]). These acts, as well as numerous statutes of these states passed to enforce their prohibition laws, were held constitutional and valid by the United States Supreme Court. In re Rahrer, 140 U. S. 545, 11 Sup. Ct. 865, 35 L. Ed. 572; Clark Distilling Co. v. Western Maryland Ry. Co., 242 U. S. 311, 37 Sup. Ct. 180, 61 L. Ed. 326, L. R. A. 1917B, 1218, Ann. Cas. 1917B, 845; United States v. Hill, 248 U. S. 420, 39 Sup. Ct. 143, 63 L. Ed. 337.

Section 1 of the Eighteenth Amendment (which alone concerns us at present), it will be noted, is not a delegation of power to be exercised, but a mandate operative by its own terms. If valid, it prohibits the manufacture of, and all dealings in, intoxicating liquors for beverage purposes throughout the United States and all the territory subject to its jurisdiction. For brevity, the transactions thereby prohibited will be hereinafter referred to as the "liquor traffic" or "trafficking in liquors." The prohibition covers both intrastate and interstate business in such beverages. Plaintiff alleges it is invalid:

First. *Because of its subject-matter.*

At the outset let us keep clearly in mind that the issue here relates solely to power—the power to amend the United States Constitution. In discussing the challenges of the plaintiff articulated under this head, that fact must not be forgotten. The other attacks upon the amendment, to be considered under separate heads, relate to the use made of the power, if it be found to exist. If the plaintiff is right in its contention of lack of power to insert the Eighteenth Amendment into the United States Constitution because of its subject-matter, it follows that there is no way to incorporate it and others of like character into the national organic law, except through revolution. This, the plaintiff concedes, is the inevitable conclusion of its contention. This is so startling a proposition that the judicial mind

may be pardoned for not readily acceding to it, and for insisting that only the most convincing reasons will justify its acceptance.

Article V of the United States Constitution, which gives express power to amend that instrument, is as follows:

"The Congress, whenever two-thirds of both houses shall deem it necessary, shall propose amenaments to this Constitution, or, on the application of the Legislatures of two-thirds of the several states, shall call a convention for proposing amendments, which, in either case, shall be valid to all intents and purposes, as part of this Constitution, when ratified by the Legislatures of three-fourths of the several states, or by conventions in three-fourths thereof, as the one or the other mode of ratification may be proposed by the Congress: Provided that no amendment which may be made prior to the year one thousand eight hundred and eight shall in any manner affect the first and fourth clauses in the ninth section of the first article; and that no state, without its consent, shall be deprived of its equal suffrage in the Senate."

This power, by the terms of this article, is not unlimited, but of the express limitations the only one now operative relates to a subject not touched upon by the Eighteenth Amendment. However, it is said the word "amendment," used in this article, carries its own limitations; that it is confined to corrections of the text, or at the most to changes in the scope of the subjects dealt with in the Constitution.

"Words in the Constitution of the United States do not ordinarily receive a narrow and contracted meaning, but are presumed to have been used in a broad sense with a view of covering all contingencies." In re Strauss, 197 U. S. 324, 25 Sup. Ct. 535, 49 L. Ed. 774.

[10] The definitions of the word "amendment" include additions to, as well as corrections of, matters already treated; and there is nothing in its immediate context (article V) which suggests that it was used in a restricted sense.

But it is argued that the Eighteenth Amendment is not germane to the powers granted to the United States by the Constitution, nor to those prohibited by it to the states; that it tends to the destruction of the several states in respect to governmental powers expressly reserved to them; and that it is an attempt to effect a fundamental change through the exercise of legislative power, which deals solely with the conduct of private individuals.

All this, it is said by plaintiff, is so inconsistent with the fundamental principles and spirit of the Constitution as to be prohibited by necessary implication. If this be so, then, as plaintiff contends, we have here a plain usurpation of power by both Congress and the ratifying states. But where is the usurpation? That the Eighteenth Amendment differs substantially from all the other amendments, save the Thirteenth, may be conceded; also that of its own force it ordains a law binding upon the several states as well as the United States. But how does this violate fundamental principles? As an answer we are referred to article 1, § 1, of the Constitution. This reads:

"All legislative powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives."

Based upon this vesting in Congress of all the legislative power granted in the Constitution, the claim is that the grant is exclusive, and that the people, whose predecessors ordained the Constitution,

may not legislate save through the instrumentality of Congress. But in the last analysis the people are the sovereigns, and both the states and the United States are only serving instrumentalities. Whatever limitations are on such sovereignty are self-imposed. Turning to article 1, referred to, it is noted that the grant of legislative power is limited to the enumeration of powers appearing in the subsequent provisions. The division into three separate, distinct, and independent departments is the outstanding, dominant feature of the governmental structure created by the Constitution. In the distribution of legislative, executive, and judicial powers, all the legislative powers granted in the Constitution were by article 1 vested solely in the legislative department, called the Congress. Among these three departments of government, the power to legislate is exclusive in the Congress; but there is no warrant here for the assumption that, as between Congress and the people, in whom the ultimate right of sovereignty resides, only Congress could legislate.

The limitations upon the people's power to change their Constitution are no more than they have chosen to make them. So far as article 1 of the Constitution is concerned, there is no limitation upon the sovereign right of the people to legislate a rule, act, or principle into their organic law.

But it is said that the Eighteenth Amendment, in respect to its subject-matter, not incidentally, but directly and deliberately, destroys the police power of the several states, in violation of the tenth article of amendment. This article is as follows:

"The powers not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people."

[2] That the police power in a very large sense is the state itself, and that no express grant or delegation of such power has ever been made to the United States government, is conceded. License Cases, 46 U. S. (5 How.) 504, 12 L. Ed. 256; Keller v. United States, 213 U. S. 138, 29 Sup. Ct. 470, 53 L. Ed. 737, 16 Ann. Cas. 1066; Noble State Bank v. Haskell, 219 U. S. 104, 31 Sup. Ct. 186, 55 L. Ed. 112, 32 L. R. A. (N. S.) 1062, Ann. Cas. 1912A, 487; Sligh v. Kirkwood, 237 U. S. 52, 35 Sup. Ct. 501, 59 L. Ed. 835. However, every grant of power to the United States, whether by the Constitution as originally framed, or by subsequent amendment, of necessity diminished the powers of the several states, and Congress, upon the making of such grant, was immediately vested with all needed and appropriate power to enforce or carry out such grant. These powers, while they remained in the states, were part of their police power. Whatever they may be termed after they become vested in the Congress, they are, in essence and practical effect, the same as had theretofore resided in the several states. McCulloch v. Maryland, 17 U. S. (4 Wheat.) 316, 4 L. Ed. 579; Lottery Case, 188 U. S. 321, 355, 23 Sup. Ct. 321, 47 L. Ed. 492; Hipolite Egg Co. v. United States, 220 U. S. 45, 31 Sup. Ct. 364, 55 L. Ed. 364; Hoke v. United States, 227 U. S. 308, 33 Sup. Ct. 281, 57 L. Ed. 523, 43 L. R. A. (N. S.) 906, Ann. Cas. 1913E, 905.

The tenth article of amendment, if not merely declaratory of what was necessarily implied in the Constitution as originally adopted, established that the undelegated powers were reserved to the several states or to the people. However, this residuum was not a fixed quantity, but would change, becoming less or greater, as an amendment increased or diminished the powers of the United States government. Therefore the fact that the Eighteenth Amendment is a further entrenchment upon the police power of the states is not in itself a violation of the social compact or fundamental principles evidenced by the Constitution; nor is the fact that this amendment's encroachment is more extensive than some or even all of its predecessors. That it does not surpass in that respect the Thirteenth Amendment must be conceded; but, if it did, that fact alone would not violate the tenth article of amendment.

The extent of the encroachment upon the police powers of the states is a political matter, to be determined by the people. That the exercise of the amending power granted by article V may encroach upon some of the state rights is true; but that is inevitable, and was necessarily contemplated when the power to amend was granted.

That the recognition and sanction of power to prohibit the liquor traffic mean the existence of power to prohibit commerce in other commodities does not follow. The traffic in intoxicating liquor stands on an entirely different footing from the commerce in ordinary commodities. In Mugler v. Kansas, 123 U. S. 623, 662, 8 Sup. Ct. 273, 297 (31 L. Ed. 205) which sustained the Kansas Prohibition Law, Mr. Justice Harlan, for the Supreme Court, said:

"We cannot shut out of view the fact, within the knowledge of all, that the public health, the public morals, and the public safety may be endangered by the general use of intoxicating drinks; nor the fact, established by statistics accessible to every one, that the idleness, disorder, pauperism, and crime existing in the country are, in some degree at least, traceable to this evil."

The fear that sustaining the right of the people to extinguish the traffic in intoxicating liquors opens the door to a like prohibition of other business, therefore, is not well founded. But, if it were, it would be of little force in dealing with the question of power. The right to exercise power inevitably carries with it the possibility of abuse, but abuse in the exercise of power is no argument against its existence. The line between a proper use and abuse of power cannot be settled in advance; but, it may be said, and that is as far as the present inquiry warrants, that whenever any other business produces like evils it may be disposed of in the same way.

[3] The plaintiff also charges that this amendment is but legislation controlling the conduct of private individuals, not alterable by the will of the majority, and is not within the power of amendment granted by article V. Undoubtedly it is not subject to change by a majority. But everything in the United States Constitution is subject to the same limitation. Whatever becomes a part of that Constitution endures until changed in the method prescribed therein. That method, by express language, prevents alteration by a mere majority. If it were otherwise, there would be little need of a written Constitution.

The manifest purpose of the limitation upon the power to amend is to prevent hasty action in altering the organic or fundamental law of the nation, and to insure ample time and careful and deliberate consideration before a change can be effected. The checks provided in requiring two-thirds of each house of Congress and the Legislatures of three-fourths of the states to concur before any alteration can be made, have hitherto proved sufficient for such purpose, and the steps leading up to the introduction of the Eighteenth Amendment into the organic law but emphasizes that this continues to be so.

The movement so to amend the Constitution had its beginning several decades ago, when the first state, by amending its Constitution, prohibited the traffic in intoxicating liquor. Its progress is marked by a procession of states amending their Constitutions for a like purpose. Whatever the motive that brought about this organic change, it cannot be said that it was hasty and unattended with deliberate action.

There being no express inhibition in the Constitution of the United States against ordaining a final permanent law, what authority is there for implying one? As already noted, article 1 is not a limitation upon the law-making power of the people, acting through constitutional means, and I fail to perceive anything in any part of the organic law that would justify a judicial interpretation forbidding the people to do so when they are convinced that on a given subject the time has come to prevent perennial changes in respect thereto.

Does the fact that this mandate denies the right of the individual to make, buy, transport, and sell intoxicating liquors require a different judgment? The power to prohibit the trafficking in intoxicating liquor is not a new one. It is now well settled that, on account of the recognized noxious qualities of and the extraordinary evils shown by experience commonly following the use of intoxicating liquors, the government has absolute power to prohibit the traffic therein. Mugler v. Kansas, 123 U. S. 623, 8 Sup. Ct. 273, 31 L. Ed. 205; Crowley v. Christensen, 137 U. S. 86, 91, 11 Sup. Ct. 13, 34 L. Ed. 620; Crane v. Campbell, 245 U. S. 304, 307, 38 Sup. Ct. 98, 62 L. Ed. 304. As noted, that always resided in the several states, and the greater number thereof have interdicted it by constitutional mandate. What the amendment does is to extend this prohibition throughout the whole Union. The power so to regulate individual conduct is no different now from what it was before the amendment was adopted, considered merely as a power; it is simply more extended in its application. It is now no longer limited to the people of the states who secured it by amending their Constitutions. It now embraces the people of the other states as well.

As a legal proposition the effect upon the individual's mode of living in the nonratifying states does not differ from that upon the nonassenting people of the several states, the greater number of the people whereof wrote prohibition into their organic law. The prohibition in the latter states applied to the nonassenting people therein, and the prohibition now written into the United States Constitution applies in the same way to the people of the nonratifying states.

The right of the people by their representatives, acting in accord-

264 F.—13

ance with article V, to write legislation into their organic law, is not without precedent. A striking example is found in the thirteenth article of amendment, prohibiting slavery throughout the United States. Abhorrent as it is to us of this day, the doctrine that one human being might have ownership in another, and traffic in him as if he were a chattel, had a legal basis. The right so to own, etc., was the creature of the laws of a number of states. This right the Thirteenth Amendment annulled. Therefore it is not accurate to say that all this amendment did was to prevent the revival of the status of slavery. That presupposes slavery to have been previously abolished and that the whole purpose of the amendment was to prevent its revival. So far as the states which sought to secede from the Union are concerned, that perhaps was its effect; but that is not so as to the other states.

The Emancipation Proclamation of President Lincoln (12 Stat. 1268) and the reconstruction acts of Congress were war measures, and applicable solely to the states then or then recently in a state of rebellion. None was intended to have, nor could have had, any effect upon the other states. The legal right of the states to establish and maintain slavery was the right of all the states, and without the adoption of the Thirteenth Amendment none of the states which had not joined in the rebellion could have been legally prevented by any power other than their own from establishing slavery and giving it the protection of their laws. An amendment to the United States Constitution was the only way to abolish such a right, and this was effected by the Thirteenth Amendment. This was done not by empowering Congress so to do, but by a positive mandate similar to the Eighteenth Amendment, and was as much legislation as is the latter.

These two amendments also have a close analogy in the control exercised over the conduct of private individuals. By the Thirteenth Amendment the right of an individual to buy, sell, possess, transport, and use another human being was absolutely prohibited. By substituting "slavery," of the Thirteenth Amendment for "intoxicating liquors for beverage purposes" of the Eighteenth Amendment, we have in legal effect the same kind of mandatory prohibition. Every argument advanced here to deny the power to incorporate the Eighteenth Amendment into the Constitution could be applied equally against the power to ordain the Thirteenth Amendment.

Indeed, in view of several provisions in the original Constitution giving distinct recognition of the right of one to hold another in involuntary servitude (article I, § 9, cl. 1; article IV, § 2, cl. 3), much more forcible argument could have been made to raise an implied limitation against the power of abolishing slavery by constitutional amendment than could be made to the Eighteenth Amendment.

To attempt to distinguish between the two prohibitions or amendments on the ground that the Thirteenth was the decision of war is futile. That the proclamation of emancipation and the reconstruction acts referred to were such may be conceded, and that the causes which led to the war and its outcome furnished the motive for the adoption of the Thirteenth Amendment, is highly probable; but that does not refute the argument that the Thirteenth Amendment was

necessary to prohibit slavery throughout the United States and every place subject to its jurisdiction.

The framers of the Constitution, from their experience with the Articles of Confederation, which, among other defects, failed to provide for their alteration unless "confirmed by the Legislatures of every state" (see article 13 of Confederation, 10 U. S. Comp. St. Ann. 1916, p. 13050), purposely inserted article V to avoid that particular and very serious defect. This article, the proper interpretation of which controls the attack here considered, took on its present form only after a number of propositions were offered, considered, and rejected or modified. It is the product of careful thought and deliberation, and was adopted with a full consciousness of the transcendent powers thereby granted. See Madison Papers, pp. 531, 532, 551, 552; also 1 Elliott's Debates, pp. 316, 317.

The rejection of most of the proposed limitations on this power and the inclusion of but one permanent disability or restriction is strong evidence that, save as to the included exception, it was intended that the legislative departments of the governments of both the United States and the several states, acting in a special capacity for such purpose, should be practically unlimited in their power to propose and adopt amendments. In this connection it should not be overlooked that the ultimate power to amend the United States Constitution is not given to the federal government, but to the people of the several states. The power of Congress in that respect ends with its proposing the amendment to the states. The ultimate and controlling act is by the people themselves, acting through their chosen representatives.

To declare an amendment so ordained void, on the ground that it runs counter to the implied limitations arising from the original document, is fraught with such dire possibilities that the power so to do by any other than the political departments of the government may well be doubted. But so far as concerns the present inquiry it is not necessary to hold or intimate that there may not be implied limitations upon this power of amendment. The Eighteenth Amendment but carries forward into the national Constitution what had already been inserted into the organic law of the greater number of states, and, if the reasons herein expressed are sound, there is no limitation in the United States Constitution, express or implied, that forbids its incorporation therein by action pursuant to article V thereof.

[4] Second. *Because Congress failed to propose the amendment in the only way authorized by article V.*

The initiative in proposing this amendment was taken by Congress. Article V of the Constitution, as to such proposal, as noted, provides:

"The Congress, whenever two-thirds of both houses shall deem it necessary, shall propose amendments," etc.

The concurrent resolution of Congress, proposing this amendment to the states, fails to declare that they "deem it necessary." That a necessity should exist, and that Congress must deem it necessary, before it proposes an amendment, is undoubted; but how does the failure of Congress so to declare in its resolution proposing the

amendment establish that it did not deem it necessary? It is a general rule that individuals and collections of individuals, such as legislative bodies, express their real mental conclusions nearer correctly and more forcibly by what they do than by what they say. Article V does not require that two-thirds of both houses shall state in words that they "deem it necessary." If they express their conclusions in actions, rather than in words, that is a compliance with the terms of the article. Other amendments, which are now a part of our organic law, were proposed to the states by Congress without such formal declaration. The public Statutes at Large, published by authority of Congress, show that all of the concurrent resolutions proposing amendments omitted such declaration. See, as to the first ten amendments, 1 Stat. 97, 98; as to the Eleventh, 1 Stat. 402; as to the Twelfth, 2 Stat. 306; as to the Thirteenth, 13 Stat. 567; as to the Fourteenth, 14 Stat. 358; as to the Fifteenth, 15 Stat. 346; as to the Sixteenth, 36 Stat. 184; and as to the Seventeenth, 37 Stat. 646.

The plaintiff asserts that as to the first 10 amendments the official publication of statutes is inaccurate, and that the resolution proposing such amendments declared that they were deemed necessary. However, it concedes that as to the subsequent amendments no such declaration is contained in the concurrent resolutions. None of these amendments has been challenged for that reason. Therefore, in proposing the Eighteenth Amendment, Congress followed a long-continued and unchallenged practice, and its omission to declare that it deemed such amendment necessary is, to say the least, not evidence of its failure to determine such necessity. Congress is not a subordinate tribunal, but a co-ordinate branch of the United States government, and is not required to set forth in its resolutions the jurisdictional facts upon which it bases its governmental action or the reasons that influenced it thereto.

[5] Furthermore, it alone, of all such departments of the government, is intrusted with the power of proposing amendments to the Constitution. In the performance of that function it acts exclusively of all the other departments, and its resolution proposing the Eighteenth Amendment to the several states carried with it the presumption that it deemed the amendment necessary. Its motives or purposes in passing the resolution are not subject to judicial investigation (McCray v. United States, 195 U. S. 27, 24 Sup. Ct. 769, 49 L. Ed. 78, 1 Ann. Cas. 561; Hamilton v. Ky. Distilleries, 251 U. S. 146, 40 Sup. Ct. 106, 64 L. Ed. —); and much less so is the form of the resolution in which it proposed this amendment to the states.

Third. *Because the amendment has not been ratified by the requisite number of states.*

Article V, on the subject of ratification of amendments proposed by Congress, as noted, provides that an amendment "shall be valid to all intents and purposes, as part of this Constitution, when ratified by the Legislatures of three-fourths of the several states." On January 29, 1919, the Acting Secretary of State of the United States, pursuant to R. S. § 205 (Comp. St. § 303), certified and published that, from official documents on file in the Department of State, the Legis-

latures of three-fourths of the whole number of states had ratified the amendment in question, and that it had become a part of the Constitution of the United States. In this certificate appear the names of 36 states whose Legislatures had so ratified.

Since such publication the Legislatures of 9 other states have ratified the amendment. Of the ratifying states, 21 have embodied in their Constitutions what is known as the referendum provision, by which the people have reserved to themselves the right to pass upon the measure passed by their Legislatures and either approve or reject them, which states will hereinafter be called "referendum states." The ratification of this amendment depends upon counting the ratifying action of the Legislatures of 12 of the referendum states.

With reference to such action, the bill, in substance, alleges that the Legislatures of the referendum states treated this ratification as final, without submission to the people thereof. It names no referendum state, and the plaintiff relies solely upon the court's taking judicial notice of the provisions of the Constitutions and laws of the several states. Thus taking knowledge, the court finds that under the Constitutions of such states the right of referendum is not absolute, but conditional, and that unless the conditions are met the acts of the Legislatures become final. Stated generally, the conditions are that only a certain number or percentage of the qualified electors can invoke the referendum, and that the proceedings for such purpose must be instituted within certain specified or limited periods.

[6] Also the bill is silent as to whether any referendum was invoked to review or pass upon any of the ratifications in question, and for aught that appears they may have become effective by lapse of time through nonaction on the part of the voters. However, without passing upon the effect such omissions might have on the plaintiff's motion for a preliminary injunction, the question whether, in spite of such referendum provisions, the ratification by the Legislatures of the referendum states was effective, will be considered on the defendants' motion to dismiss the bill. The question thus raised turns solely upon the interpretation of the word "Legislature" in article V. This article has never been altered since it was incorporated in the Constitution as originally adopted. It, and not the Constitutions of the several states, controls the method by which the United States Constitution may be amended. At the time of the adoption of the Constitution the term "Legislature" had a well-defined meaning. The 13 original states each had a representative assembly, generally known as a Legislature. That it was a Legislature of this kind, viz., a representative body empowered to act for the people in the matter of legislation, and distinct from the people themselves, which was in the minds of those who constituted the convention which framed the United States Constitution, is established by the uses made of such term throughout the whole document.

Of these I note that by Const. U. S. art. 1, § 3, cls. 1, 2, the United States Senators are to be chosen by the Legislatures of their states; and vacancies occurring during the recess of the state Legislatures are to be filled by the executive of such state until the next meeting

of the Legislature. This has been changed by the adoption of the Seventeenth Amendment, and concededly there was no other way to bring about the election of United States Senators directly by the people. By article IV, § 4, wherein the United States is charged with the duty of guaranteeing a republican form of government to every state, the United States is required, on the application of the Legislature, or of the executive of a state (when the Legislature cannot be convened), to protect such state against domestic violence. In these two provisions we have striking evidence that a body distinct and acting separately from the people was intended by the use of the term "Legislature"—a body meeting periodically, and which may be in recess. The people cannot be in a state of recess, and they cannot be convened. However, their representatives in legislative assembly do convene periodically, and therefore are at times in recess. By article VI, cl. 3, the members of the several state Legislatures are to be bound by oath or affirmation to support the United States Constitution. This also unerringly points to a body separate and distinct from the people at large, for the latter are not required so to swear or affirm, and, in fact, none save naturalized citizens do so.

The same idea dominates the use of the word in the fourteenth article of amendment, adopted 80 years after the framing of the Constitution. Section 2 thereof refers to the possible denial of United States citizens' right to vote for the members of the state Legislatures, and section 3 to the disqualification to hold office of any person who, having previously taken an oath as a member of any state Legislature to support the Constitution of the United States, had engaged in insurrection, etc. In all the particulars here referred to, "Legislature" by no possibility could have meant the body of the people. This word occurs twice in article V (one of the uses being now under consideration), and also in parts of the Constitution other than here particularly pointed out; but in no instance is there any indication that it was used to refer to the people, or to any body other than their chosen representatives, to whom they had delegated a part of the state's governmental powers.

Congress, in its concurrent resolution proposing the Eighteenth Amendment, as well as in its previous proposals of amendments to the states, referred to "Legislature" in relation to their ratification by the states, and all the amendments that have become a part of the United States Constitution have been submitted to and ratified by the legislative assembly referred to, and not by the people direct.

The ratifications here challenged have been recognized as effective by the two political departments of the United States government. The proclamation of the adoption of the Eighteenth Amendment by the Acting Secretary of State, the enactment by Congress of the "National Prohibition Act," and the enforcement of such legislation by the Department of Justice, are all founded thereon. In article V, as noted, two methods are authorized for the ratification of amendments, one by convention and the other by Legislatures. If the method by convention had been chosen, would the ratifying action by the convention have been subject to a referendum vote by the people? Mani-

festly not, if the express language of the Constitution is conclusive; and, if not, where is the warrant for holding that ratification by the Legislatures requires such a referendum vote?

The two methods are alike in the respect that the act of ratifying is done, not by the people direct, but by their representatives in conventions or Legislatures. The people of the 13 original states, through their conventions called pursuant to article VII of the proposed United States Constitution, ratified it in the form proposed. In so ratifying, they delegated the power of amendment to their representatives, designating them and prescribing the function of each. Dodge v. Woolsey, 59 U. S. (18 How.) 331, 348, 15 L. Ed. 401. This delegated power the people have never retaken. Having so delegated the power of amendment, it cannot be executed in any way other than as prescribed, nor by any instrumentality other than there designated.

If a change in the method of proposing or ratifying amendments to the United States Constitution is desired, the way to bring it about is by altering article V thereof, and that cannot be done by changing merely the Constitutions of the individual states. However effective the state referendum requirements may be as to matters affecting the state alone, or in influencing members of the Legislature not to ratify proposed amendments to the United States Constitution without causing a referendum to be taken, such requirements cannot affect the United States Constitution, or bring about a change in the method of amending it. Neither Congress in proposing the amendments, nor the state Legislatures in ratifying, act in their legislative capacity, but in pursuance of a special power granted them by article V. Neither proposal nor ratification need be presented to the executive or any one else for approval. Both acts are complete when performed. When the Legislature (the assembled representatives of the people as distinguished from the people themselves) of a referendum state ratifies an amendment to the United States Constitution, such act is the ratification contemplated by article V of that Constitution, even though made without an approving referendum vote.

The courts of the referendum states that have had occasion to pass upon the question here considered are in disagreement. I am in accord with the following cases: Herbring v. Brown (Or.) 180 Pac. 328; In re Opinion of the Justices (Me.) 107 Atl. 673. I have read the majority opinions in State ex rel. Mullen v. Howell (Wash.) 181 Pac. 920, and Hawke v. Smith (Ohio) 126 N. E. 400, holding a contrary view, but cannot agree with the reasoning thereof.

II. The Alleged Invalidity of Title 2 of the "National Prohibition Act."

[7] First. *Because the act lacks the concurrence of the state of New Jersey.*

The allegation of the bill in this behalf is:

"Because the state of New Jersey has not concurred in the provisions of said act of Congress of October 28, 1919, Exhibit II, and said provisions, if enforced without its concurrence, would violate, override and nullify the rights and powers vested in and reserved to the state of New Jersey in re-

spect of its internal and intrastate affairs and concerns under the Constitution of the United States and the amendments thereto, and would deny to the plaintiff its constitutional right and liberty to carry on its business and manufacture and sell its nonintoxicating products as duly authorized by the laws of the state of New Jersey." Paragraph XII, cl. 5.

This involves the interpretation of section 2 of the Eighteenth Amendment, and in particular the meaning of the word "concurrent" as used therein. The section reads as follows:

"Sec. 2. The Congress and the several states shall have concurrent power to enforce this article by appropriate legislation."

This word is defined by the Century Dictionary as:

"1. Meeting in a point; passing through a common point.
"2. Concurring, or acting in conjunction; agreeing in the same act; contributing to the same event or effect; operating with; coincident. ·
"3. Conjoined; joint; concomitant; co-ordinate; combined."

By Funk & Wagnalls' Standard Dictionary as:

"1. Occurring or acting together; as, concurrent signs, concurrent forces.
"2. Meeting or joining at the same point; running together; as, concurrent lines.
"3. United in action or application; co-ordinate; concomitant; as, concurrent remedies or jurisdiction. Concurrent days, days added to make the civil correspond to the solar year."

And by Black's Law Dictionary (2d Ed.) as:

"Having the same authority; * * * contemporaneous."

Of these different definitions, the plaintiff has accepted "having the same authority, acting in conjunction," and "agreeing in the same act," and insists that these are the meanings intended by Congress in inserting "concurrent" into the second section of this amendment. Under such restricted meanings, Congress and the Legislatures of the several states would have to agree upon every phase of the intended enforcing legislation, either as a whole in one act of legislation—practicably impossible—or by separate acts of legislation applicable to the several states, respectively. This would lead to irreconcilable differences rather than to practical enforcing legislation. To impute to Congress and the ratifying states such an impracticable purpose in. the use of that word is unthinkable, and such imputation is not to be accepted, unless no other meaning of the word is permissible, or it clearly appears that such restricted meaning was the only one in the mind of Congress when this section was framed. Of the other authorized definitions of the word, we have, as noted:

"Contributing to the same act or effect; operating with; coincident."
"Occurring or acting together; as concurrent signs, concurrent forces."
"Meeting or joining at the same point; running together; as, concurrent lines."
"United in action or application; * * * concurrent remedies or jurisdiction."

Congress framed the proposed amendment, and to it was open any of these meanings of the word, and it is not to be restricted to any one meaning that the spirit of advocacy of any particular construction may suggest. That meaning which will carry out the intended purpose of

Congress should be given to this word. The thing sought to be prohibited is the manufacture of and commerce in intoxicating liquors for beverage purposes, and the prohibition extends throughout the United States and all territory subject to its jurisdiction. Only the enforcement of this prohibition is subject to the legislative power, and this power is delegated to both Congress and the several states. If congressional action, to be effective, is dependent upon each of the states joining with it in its enforcement legislation, an absolute failure to effect such legislation is not merely possible, but decidedly probable.

Based upon its selection of the more restricted meaning of "concurrent," the plaintiff contends that, so far as concerns the manufacture, sale, and transportation of intoxicating liquors for beverage purposes within a state (intrastate business), no enforcement act of Congress, affecting such business, has any legal force or effect, unless the state concurs therein. The practical effect of this limitation of the power of Congress is to confine its enforcement legislation to such manufacture as might be carried on in territories subject to the United States and to commerce with foreign nations (imports and exports) and among the several states (interstate). Such a limitation would deprive Congress of any effective control over by far the greater part of the business, the outlawry of which the amendment was intended to accomplish. It would give it no voice as to what should constitute intoxicating liquor when made the subject of intrastate business, and no regulation prescribed by it would have any effect on such business.

In such a division of power, no uniformity as to what is intoxicating liquor, or of regulations to prevent or detect violations, could be reasonably expected. The differences in the percentages of alcohol allowed could be as numerous as the states, and the power of Congress would be practically confined to the prevention of smuggling the intoxicating liquor containing the greater quantity of alcohol from the states where it could lawfully be made and vended to those states where only that of a lesser alcoholic content was lawful. When results of this kind are likely to flow from accepting the more limited definition of the word "concurrent" and the division of power built thereon, one naturally looks to the more enlarged meaning as more likely to reflect the purpose of Congress in using that word. Turning to the amendment, it is not perceived that any division in the enforcing power, such as is contended for by the plaintiff, was contemplated. It makes no such division; it deals with the subject-matter as an entirety, operates upon the whole of the United States and all territory subject to its jurisdiction, and the grant of power to enforce its prohibitions is as comprehensive as may be necessary or appropriate.

The amendment obliterates the distinction between interstate and intrastate commerce, so far as its subject-matter is concerned. The prohibition of the first section of the amendment is self-executing to the extent that it outlaws the manufacture of and commerce in intoxicating liquors as a beverage throughout the entire nation. It takes no note of state boundaries, whether the prohibited business is carried on exclusively within a state or extends beyond. The en-

forcing power granted by section 2 is intended to prevent a violation of the prohibition of section 1. This power so to enforce is granted to both Congress and the states. The word "concurrent" does not divide the power, but authorizes them both to exercise it by "appropriate legislation."

The failure of Congress to enact enforcing legislation would not affect the right of the states to do so. In such case, if the state acted, its legislation would be the only rule on the subject. However, such legislation would be operative only within the boundaries of the state. This, not because of any express limitation contained in the amendment, but solely for the reason that its jurisdiction extends no farther.

But when Congress acts to enforce this amendment, its command extends throughout the Union. This, also, is not due to any express authority found in the amendment, but because its enactments operate throughout the whole land. In thus legislating it acts independently of and without consulting the states. Whether the states concur therein is a matter for their sole determination. Failure on their part to co-operate with Congress casts the duty of enforcing the amendment within the boundaries of the nonconcurring states solely on the United States authorities. Again, if a state enacts legislation which in any particular is antagonistic to the law of Congress, such legislation must give way to the act of Congress. This supremacy of the acts of Congress results, not from any express provision to that effect contained in the Eighteenth Amendment, but because of other provisions of the United States Constitution. In article VI thereof it is declared that:

"This Constitution, and the laws of the United States which shall be made in pursuance thereof, and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any state to the contrary notwithstanding."

By reason of this provision such a thing as a legal conflict between the laws of Congress, enacted pursuant to the powers granted or delegated to it, and the legislation of any of the states, is constitutionally impossible.

The United States and the several states have concurrent power over other subjects than the one dealt with by this amendment. In the exercise thereof by both the state Legislatures and Congress, it has occasionally happened that conflicts in legislation resulted. However, the moment the antagonism occurs, the legal conflict is ended in favor of the acts of Congress, and an attempt to substitute the state legislation for that of Congress is abortive. Such conflicts began quite early after the inauguration of our system of dual government. In Gibbons v. Ogden, 22 U. S. (9 Wheat.) 1, 210 (6 L. Ed. 23), in a conflict engendered by the passage of an act by the New York Legislature granting exclusive navigation of all the waters within the jurisdiction of that state to certain persons, Mr. Chief Justice Marshall, speaking for the Supreme Court, said:

"Since, however, in exercising the power of regulating their own purely internal affairs, whether of trading or police, the states may sometimes enact laws, the validity of which depends on their interfering with, and being

contrary to, an act of Congress passed in pursuance of the Constitution, the court will enter upon the inquiry, whether the laws of New York, as expounded by the highest tribunal of that state, have, in their application to this case, come into collision with an act of Congress, and deprived a citizen of a right to which that act entitles him. Should this collision exist, it will be immaterial whether these laws were passed in virtue of a concurrent power 'to regulate commerce with foreign nations and among the several states,' or in virtue of a power to regulate their domestic trade and police. In one case and the other, the acts of New York must yield to the law of Congress; and the decision sustaining the privilege they confer, against a right given by a law of the Union, must be erroneous. This opinion has been frequently expressed in this court, and is founded as well on the nature of the government as on the words of the Constitution. In argument, however, it has been contended that if a law passed by a state, in the exercise of its acknowledged sovereignty, comes into conflict with a law passed by Congress in pursuance of the Constitution, they affect the subject, and each other, like equal opposing powers. But the framers of our Constitution foresaw this state of things, and provided for it, by declaring the supremacy, not only of itself, but of the laws made in pursuance of it. The nullity of any act, inconsistent with the Constitution, is produced by the declaration that the Constitution is the supreme law. The appropriate application of that part of the clause which confers the same supremacy on laws and treaties is to such acts of the state Legislatures as do not transcend their powers, but, though enacted in the execution of acknowledged state powers, interfere with, or are contrary to, the laws of Congress, made in pursuance of the Constitution, or some treaty made under the authority of the United States. In every such case, the act of Congress, or the treaty, is supreme; and the law of the state, though enacted in the exercise of powers not controverted, must yield to it."

The doctrine here announced has been consistently adhered to. Mr. Justice Harlan, in Northern Securities Co. v. United States, 193 U. S. 197, 347, 348, 24 Sup. Ct. 436, 461 (48 L. Ed. 679) said that this was—

"vital to the United States as well as to the states, that a state enactment, even if passed in the exercise of its acknowledged powers, must yield, in case of conflict, to the supremacy of the Constitution of the United States and the acts of Congress enacted in pursuance of its provisions. This results, the court has said, as well from the nature of the government as from the words of the Constitution."

If section 2 of the amendment had not been ordained, Congress would still have had ample power to enforce the prohibition decreed by section 1 thereof by appropriate legislation enacted under article 1, § 8, last clause of the Constitution of the United States, which reads as follows:

"To make all laws which shall be necessary and proper for carrying into execution the foregoing powers, and all other powers vested by this Constitution in the government of the United States, or in any department or officer thereof."

But without section 2 of the Eighteenth Amendment, the states would have had no power to enforce the prohibition. This disability was removed by including the states with Congress in that section. However, the use of the word "concurrent" gave the states no power to engage in a legislative conflict with Congress. The states possess power granted by this amendment, as they possess all other concurrent powers—dominant, when they alone exercise it; subordinate, when it is exercised by Congress.

The prohibitory section of the Eighteenth Amendment is of national scope and operation, and its efficacy depends upon its being nationally enforced. Its enforcement section was nationally envisaged, as was the need of the co-operation of the several states to secure general observance. To carry out such a concept, Congress alone of all the legislative bodies must take the lead, and its leadership, when assumed, dominates.

The administrative machinery of the several states is well adapted for immediate and efficient use, and the co-operation by the states with Congress would be of great value to the federal authorities, who, under the National Prohibition Act, are required initially to carry out its provisions. But, as noted, there is no constitutional constraint upon a state so to co-operate. It may choose so to do or not. If it fails to act at all, the enforcement of such statute within its borders falls exclusively upon the executive departments of the United States government. If the state enacts legislation, whether under the Eighteenth Amendment or in pursuance of its police power, and it authorizes or permits the doing of anything already forbidden by the acts of Congress (as the state of New Jersey has done since the filing of this bill) such authorization or permission, for the reasons given, will be rendered unlawful ab initio by such contrary determination of Congress, and will afford no protection to any who may violate the congressional statute.

[8] Second. *Because its definition of intoxicating liquor is wholly without basis in fact, and therefore arbitrary and oppressive and unconstitutional.*

In section 1 of title 2 of the "National Prohibition Act" Congress has defined what is intoxicating liquor, within the meaning of that act. The section, so far as it relates to such definition, is as follows:

"Section 1. When used in title II and title III of this act (1) the word 'Liquor' or the phrase 'Intoxicating liquor' shall be construed to include alcohol, brandy, whisky, rum, gin, beer, ale, porter, and wine, and in addition thereto any spirituous, vinous, malt, or fermented liquor, liquids, and compounds, whether medicated, proprietary, patented, or not, and by whatever name called, containing one-half of 1 per centum or more of alcohol by volume which are fit for use for beverage purposes: Provided, that the foregoing definition shall not extend to dealcoholized wine nor to any beverage or liquid produced by the process by which beer, ale, porter or wine is produced, if it contains less than one-half of 1 per centum of alcohol by volume, and is made as prescribed in section 37 of this title, and is otherwise denominated than as beer, ale, or porter, and is contained and sold in, or from, such sealed and labeled bottles, casks, or containers as the commissioner may by regulation prescribe."

The plaintiff not only assails the general definition, which makes a liquor containing one-half of 1 per centum or more of alcohol by volume intoxicating, but also the more restricted definition which also makes beer, ale, or porter containing "less than one-half of 1 per centum of alcohol by volume" intoxicating, unless they are otherwise denominated than such beverages, and are contained and sold in containers sealed and labeled in accordance with the regulations prescribed by the Commissioner of Internal Revenue. But the plaintiff's bill is not framed to question this additional and more restricted definition.

The bill alleges that the plaintiff has on hand large quantities of "nonintoxicating war beer," concededly containing more than one-half of 1 per centum of alcohol (paragraph VII), and that for it to discontinue the manufacture and sale of that kind of beer, to comply with the provisions of the "National Prohibition Act," would be destructive of its business and property (paragraph XIV). The bill nowhere alleges that the plaintiff has on hand, or intends to manufacture and sell beer, ale, or porter containing less than one-half of 1 per centum of alcohol. On the contrary, it alleges that beer containing less than that percentage "cannot be successfully or profitably substituted by it in its business for the war beer it has heretofore manufactured and sold." Paragraph XV.

In paragraph V, devoted to stating the percentage of alcohol contained in the plaintiff's products since the passage of the act of Congress of August 10, 1917 (the Lever Act), there is a parenthetical statement that since October 28, 1919, plaintiff has manufactured and sold some malt liquors containing less than one-half of 1 per cent. of alcohol by volume. But nowhere is there an allegation that plaintiff has any such liquor on hand which it desires to sell in containers labeled otherwise than the act provides, or that it desires to resume the manufacture or sale of any such liquors.

The gravamen of the complaint is that the congressional definition that malt liquors containing one-half of 1 per cent. of alcohol by volume, which are fit for use for beverage purposes, are intoxicating, is illegal, and that the defendants intend to prevent plaintiff from manufacturing and selling liquor containing that percentage of alcohol and its so-called war beer, which have a greater alcoholic content, but not exceeding 3.4 per cent. in volume. The judicial inquiry here is therefore limited to whether Congress has the power under the Eighteenth Amendment to determine that malt liquors containing but one-half of 1 per cent. of alcohol, and fit for beverages purposes are intoxicating.

Plaintiff does not contend that Congress may not enact a definition. It undoubtedly has the power, within limitations, to determine facts. See Jacobson v. Massachusetts, 197 U. S. 11, 25 Sup. Ct. 358, 49 L. Ed. 643, 3 Ann. Cas. 765. However, the determination must not be arbitrary. Is the definition of intoxicating liquors as "containing one-half of 1 per centum or more of alcohol by volume which are fit for use for beverage purposes," without basis in fact, and, therefore, arbitary and void? It is the presence of alcohol that makes liquor intoxicating. Experts differ in their beliefs and opinions as to what quantity of alcohol will or will not produce intoxication. The effect of the same quantity upon different persons varies, depending upon a number of conditions, and defying exact definition.

A failure to define legislatively what was intoxicating liquor would of necessity refer that question to judicial decision. This would inevitably result in a serious lack of uniformity of decision as to what constitutes intoxicating liquor. As persons are affected differently by liquor containing the same percentage of alcohol, and as in the absence of a fixed standard the effect upon the individual would most

frequently control the decision, we would have conflicting decisions as to liquor drawn or poured from the same container at the same time. Such results would conduce neither to a proper enforcement of the Prohibition Amendment nor to a due respect for the administration of laws generally. Therefore, when Congress concluded, as it had a constitutional right to do, that a definition was necessary for a proper enforcement of the Prohibition Amendment, it, in determining what should be the standard, engaged in a work that necessarily involved discretion, the bounds of which were only that it should be reasonably exercised. If, in its exercise of such discretion, it determined that the proper enforcement of such prohibition required that a percentage be adopted that would certainly prevent intoxicating liquors being made and bartered, and the adopted basis or percentage has a reasonably appreciable relation to the subject-matter of the prohibition, it cannot be judicially condemned as arbitrary. This seems to be the rationale of both the prevailing and dissenting opinions in Ruppert v. Caffey et al. (decided Jan. 5, 1920) 251 U. S. 264, 40 Sup. Ct. 141, 64 L. Ed. ——.

In that case the definition of intoxicating liquor for the purpose of title 1 of this same enactment—National Prohibition Act—was under attack. The decision there reached is controlling here. Title 1 of the act had for its purpose the enforcement of war prohibition, and defined the words "beer, wine, or other intoxicating malt or vinous liquors," as contained in the War Prohibition Act, "to mean any such beverages which contains one-half of 1 per centum or more of alcohol by volume." At the time of the passage of the National Prohibition Act, the Eighteenth Amendment had not become a part of the Constitution, and therefore was lacking as an express authorization to enforce the definition contained in that title. However, the power of Congress to define what is intoxicating liquor for the purpose of enforcing the War Prohibition Act, as well as the particular definition there drawn into question, was upheld as within the war powers of Congress. In the prevailing opinion, Mr. Justice Brandeis, in support of such proposition, said:

"If the war power of Congress to effectively prohibit the manufacture and sale of intoxicating liquors in order to promote the nation's efficiency in men, munitions, and supplies is as full and complete as the police power of the states to effectively enforce such prohibition in order to promote the health, safety, and morals of the community, it is clear that this provision of the Volstead Act is valid, and has rendered immaterial the question whether plaintiff's beer is intoxicating. For the legislation and decisions of the highest courts of nearly all of the states establish that it is deemed impossible to effectively enforce either prohibitory laws or other laws merely regulating the manufacture and sale of intoxicating liquors, if liability or inclusion within the law is made to depend upon the issuable fact whether or not a particular liquor made or sold as a beverage is intoxicating. * * * A test often used to determine whether a beverage is to be deemed intoxicating, within the meaning of the liquor law, is whether it contains one-half of 1 per cent. of alcohol by volume. * * * The decisions of the courts, as well as the action of the Legislatures, make it clear—or, at least, furnish ground upon which Congress reasonably might conclude—that a rigid classification of beverages is an essential of either effective regulation or effective prohibition of intoxicating liquors."

This decision was by a bare majority, but the minority opinion based its dissent, not upon the lack of power in Congress to give to the word "intoxicating" a legislative meaning which would be conclusive in litigation, but that, as the Eighteenth Amendment had not become effective, Congress had "no general power to prohibit the manufacture and sale of liquors," and that there is no appreciably reasonable relationship between the challenged enactment and the war power which was the only constitutional power that could then be invoked for such definition.

The identical definition sustained in that case was employed by Congress in title 2 of the same act, which contains the provisions for the enforcement of the constitutional prohibition then soon to go into effect. If, as held in the cited case, the war power of Congress is sufficient to sustain its definition of what is intoxicating liquor, where the purpose was the enforcement of legislation prohibiting the sale of intoxicating liquors for beverage purposes until the termination of the war—at most a temporary period—it follows beyond peradventure that Congress possesses the same power of definition in enacting legislation directed to the enforcement of the constitutional mandate prohibiting permanently the traffic in the same commodity. The definition is not arbitrary, but, on the contrary, has a rational basis for its support. Indeed, keeping in mind the purpose of Congress to enforce the Prohibition Amendment, it is very appropriate legislation. •

[9] Third. *Because it takes without compensation and destroys plaintiff's nonintoxicating beverages without due process of law, in violation of the fifth article of amendment to the Constitution.*

The pertinent part of this amendment is:

"Nor shall private property be taken for public use without just compensation."

The allegations of the bill on which this attack is based in substance are that the plaintiff, on the date of the passage of the "National Prohibition Act," had and still has on hand a large quantity of valuable non-intoxicating war beer theretofore lawfully produced; that the act allows no reasonable period for its sale or disposition (paragraph VII); that plaintiff cannot convert said war beer into beer containing less than one-half of 1 per cent. of alcohol without destroying a large part of the value of said product (paragraph XV); and to enforce against the plaintiff the provisions of title 2 of the act, and thereby prevent it from manufacturing and selling war beer, "its valuable business and good will would be destroyed, all profit therefrom would be rendered impossible, the value of its property as a going concern would be destroyed and dissipated, * * * its intricate and costly plant and physical assets would be at once depreciated to its junk or salvage value only," to its "great and irreparable injury and damage" (paragraph XIV).

The alleged destruction of plaintiff's business and good will, and the depreciation in value of its physical property, are not a taking of property for public use, within the meaning of the fifth article of amendment. This is no longer an open question. In Ruppert v.

Caffey et al., supra, this same question was necessarily passed upon, and was decided against the contention that is now made here. There it was held competent for Congress, in the exercise of its war powers, if, in its opinion, an immediate cessation of the traffic in like liquors was necessary, to order its discontinuance. In this connection the Supreme Court, speaking by Mr. Justice Brandeis, said:

"Hardship resulting from making an act take effect upon its passage is a frequent incident of permissible legislation; but whether it shall be imposed rests wholly in the discretion of the law-making body. That the prohibition of the manufacture of nonintoxicating beer, if permissible at all, may be made to take effect immediately, follows necessarily from the principle acted upon in Mugler v. Kansas, 123 U. S. 623, 669, 8 Sup. Ct. 273, 31 L. Ed. 205, since the incidents attending the exercise by Congress of the war power to prohibit the liquor traffic are the same as those that attend the states' prohibition under the police power. In the Mugler Case, also, the breweries were erected at a time when the state did not forbid the manufacture of malt liquors; and there it was alleged that the prohibition, which became effective almost immediately, would reduce the value of one of the breweries by three-fourths and would render the other of little value. Here, as there, the loss resulting to the plaintiff from inability to use the property for brewery purposes is an incident of the peculiar nature of the property, and of the war need, which, we must assume, demanded that the discontinuance of use be immediate. Plaintiff cannot complain because a discontinuance later would have caused him a smaller loss. This, indeed, appears to be conceded so far as concerns the brewery and appurtenances. The objection on the ground that the prohibition takes effect immediately is confined to the prohibition of the sale of the beer on hand at the time of the passage of the act. But as to that also we cannot say that the action of Congress was unreasonable or arbitrary."

What Congress has the power to do, in exercising an implied power, it assuredly may do in the carrying out of an express power. The alleged loss to plaintiff, which it is said will necessarily result from an enforcement of the "National Prohibition Act," is incidental to the exercise by Congress of a constitutional power, and it alone determines whether compensation shall be made for such loss.

In view of these conclusions, the plaintiff's motion for a preliminary injunction is denied, and the defendants' motion to dismiss the bill is granted.